BURKE, Judge.
Bart Wayne Johnson was convicted of two counts of murder made capital because the victim was a police officer who was on duty, see § 13A-5-40(a)(5), Ala.Code 1975, and because the murder was committed by or through the use of a deadly weapon fired within or from a vehicle, see § 13A-5-40(a)(18), Ala.Code 1975. The jury, by a vote of 10 to 2, recommended that Johnson be sentenced to death. The trial court followed the jury's recommendation. Johnson appeals his convictions and death sentence.
Before trial, Johnson informed the trial court that he would not proceed on his plea of not guilty and that he would proceed solely on the plea that he was not guilty by reason of mental disease or defect at the time of the offense. (R. 87-88.)
Facts
At trial, the State set forth evidence indicating the following. Shortly before midnight on December 3, 2009, Phillip Davis, a police officer employed by the City of Pelham, stopped Johnson in Pelham as he was driving north on Interstate Highway 65. The traffic stop was recorded on a digital camera located in Officer Davis's vehicle. Officer Davis also had a wireless microphone attached to his person that recorded sound during the traffic stop. The digital recording was played for the jury at trial.
Officer Davis notified the dispatch center of the traffic stop before exiting his vehicle. After exiting his vehicle, Officer Davis approached the driver's side window of Johnson's vehicle, which was an Acura sedan that had a personalized Alabama license plate that read "JCREW1." Officer Davis informed Johnson that he was being stopped for speeding and asked him for his driver's license. Officer Davis then asked Johnson: "Is this your car?" Johnson responded: "Nah, I just stole it." Officer Davis replied: "I'm glad you're in a jovial mood. The only reason I asked is to see if you have your proof of insurance. Sometimes when you're borrowing a car you don't know where it is." After receiving Johnson's driver's license, Officer Davis returned to his vehicle. While Officer Davis was in his vehicle, Johnson turned off the interior lights of his vehicle and raised the automatic sunshade in the rear window of his vehicle. After approximately five minutes, Officer Davis returned to the driver's side window of Johnson's vehicle to issue Johnson a speeding ticket. Officer Davis asked Johnson where he worked, and Johnson responded: "I don't see why it matters." Officer Davis replied: "Okay. Unemployed." Officer Davis then wrote on the ticket. Johnson then stated: "Man, I've been on the road for like four hours, man. My brother is a cop. I totally understand that you're just doing your job." Officer Davis responded:
*698 "Now, you want to be cool? Now, you want to start acting reasonable? Now? Now that I've brought a ticket up here, you want to start being reasonable? That's amazing. Have your brother call me, and I'll tell him how you acted, and then we'll see how that works out, okay?"
Officer Davis then leaned toward the driver's side window and stated: "I need your signature at the bottom." Immediately, Johnson shot Officer Davis in the face with a pistol, and Officer Davis fell to the ground. Johnson then drove away without delay.
Dr. Alfredo Paredes, a senior medical examiner with the Alabama Department of Forensic Sciences, performed the autopsy on Officer Davis's body on December 4, 2009. Dr. Paredes testified that Officer Davis "died from a gunshot wound to the face that injured his spinal column." (R. 1515.) Dr. Paredes also testified that, based on his examination of the gunshot wound, the gunshot was fired within a few inches of Officer Davis's face. (R. 1507.)
A couple of minutes after the shooting, a truck driver observed Officer Davis's body lying across the fog line of the right-hand lane of the interstate. The truck driver stopped and telephoned emergency 911. The police officers who initially responded to the scene of the shooting discovered Officer Davis's ticket book lying near his body. The most recent ticket in the book contained information about Johnson, including his name, his address, a description of his vehicle, and his license-plate number. A few minutes after arriving at the scene of the shooting, the officers watched the digital recording of the traffic stop in Officer Davis's vehicle, and they were able to see what had transpired.
Shortly after midnight on December 4, 2009, Loleatha Story, who lives in the Inglenook neighborhood on the northern side of Birmingham, heard a vehicle drive into the alley beside her house. Story looked out her window and saw an Acura sedan park in the alley. Story saw a white male get out of the Acura, walk to her daughter's vehicle that was parked near the house, and attempt to open the door of her daughter's vehicle. Story asked the man what he was doing. The man responded by raising his hand and walking away. Story then called the police and gave them the license-plate number of the Acura, which was "JCREW1". The police informed Story that they were looking for that vehicle and that she should not go outside. Story continued to look out her window, and she observed someone in a gray Toyota Tundra truck pick up the driver of the Acura and drive away. A map of Story's neighborhood was admitted into evidence at trial.
Shortly after the police officers responded to the scene of the shooting and observed what had transpired, they issued a notice to "be on the look out" ("BOLO") for an Acura sedan with a "JCREW1" license plate. Approximately one hour after the shooting, Jason Grant, a police officer employed by the City of Trussville, became aware that the owner of the Acura sedan was the brother of another Trussville police officer, Bill Johnson ("Bill"), and that another officer had recently seen Bill's gray Toyota Tundra traveling down the road. Officer Grant then telephoned Bill and directed him to go to Johnson's house in Kimberly, which is a community on the northern side of Birmingham. About five minutes later, Officer Grant telephoned Bill again to make sure that he was going to Johnson's house. At that time, Bill stated that he had not been in contact with Johnson and that he was going to his sister's house that was south of Birmingham because, Bill said, Johnson had been temporarily living at that house.
*699 Officer Grant responded by ordering Bill to go to Johnson's house, and Bill replied that he would go to Johnson's house. However, Bill never went to Johnson's house.
Around 1:30 a.m. on December 4, 2009, Officer Grant became aware that the Acura sedan with the "JCREW1" license plate had been found in Inglenook and that the driver of the Acura had been picked up in a truck matching the description of Bill's truck. Officer Grant telephoned Bill again and informed him that a BOLO had been issued for his truck and that he needed to immediately stop if he saw any police officers.
After the telephone conversation with Officer Grant and while traveling southbound on Interstate Highway 65 with Johnson in the truck, Bill stopped on the side of the interstate near some police officers from the City of Hoover, and Bill and Johnson exited the truck. The Hoover police officers took Johnson into custody without resistance. As Johnson was being taken into custody, he was asked whether he was Bart Johnson. Initially, Johnson did not reply, but as he was being taken to a police vehicle, he stated: "Hey, man, I'm your guy. I'm the one you're looking for." (R. 1407.)
A .40 caliber pistol was recovered from the glove compartment of Bill's Toyota Tundra truck. DNA analysis revealed that, with a high degree of certainty, blood found on that pistol came from Officer Davis. DNA analysis further revealed that, with a high degree of certainty, blood found on Johnson's Acura sedan and on his clothing came from Officer Davis.
The defense set forth evidence indicating the following. Johnson was employed as a pharmacist by Fred's Pharmacy. Wes Maddox, a pharmacist who was in charge of Fred's Pharmacy stores in Alabama and who had worked with Johnson, testified that he was not aware that Johnson had any anger issues and that Johnson was a good employee. In the days leading up to the shooting, Johnson had been working in Bayou La Batre at the grand opening of a new Fred's Pharmacy store. Maddox testified that, at his request, Johnson had assisted with opening the new store on November 19-20, 2009, and November 30-December 3, 2009. Maddox further testified that the grand opening had been stressful and that Johnson had worked long hours during that time.
Dr. Albert Smith, a family-practice physician, testified that he had treated Johnson for migraine headaches and that he had prescribed Imitrex to Johnson to help alleviate his symptoms. Dr. Smith stated that he had seen anxiety listed as one of the possible, but rare, side effects of Imitrex.
Dr. Charles Golden testified for the defense as a mental-health expert. Dr. Golden examined Johnson, interviewed several of his family members, and watched the digital recording of the shooting. Dr. Golden concluded that Johnson suffered from dyssomnia, a somatoform disorder, and a personality disorder that included aspects of depression, anxiety, and paranoia. Dr. Golden further concluded that Johnson suffered an acute or brief psychotic episode that rendered him incapable of understanding the wrongfulness of his acts at the time he shot Officer Davis.
In rebuttal, the State presented expert testimony from Dr. Thomas Boll and Dr. Glen King. Dr. Boll and Dr. King examined Johnson. Dr. Boll testified that, in his opinion, Johnson did not suffer from a brief psychotic disorder, an undifferentiated somatoform disorder, or a depersonalization disorder not otherwise specified. Dr. Boll further testified that he did not find any evidence of any type of psychotic *700 process or thought disorder. Dr. King testified that, in his opinion, on December 3, 2009, Johnson was not suffering from a severe mental disease or defect that rendered him incapable of appreciating the nature and quality or the wrongfulness of his acts.
Discussion
In his brief to this Court, Johnson raises several issues that were not first raised in the trial court; thus, those issues were not preserved for appellate review. Nevertheless, because Johnson was sentenced to death, his failure to raise those issues in the trial court does not prevent this Court from reviewing those issues for plain error.
Rule 45A, Ala. R.App. P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
In Wilson v. State, 142 So.3d 732, 751 (Ala.Crim.App.2010) (opinion on return to remand), this Court stated:
" '[T]he plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." ' United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) ). 'The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.' Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999). Under the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial. See Ex parte Walker, 972 So.2d 737, 752 (Ala.2007) (recognizing that the appellant has the burden to establish prejudice relating to an issue being reviewed for plain error); Thomas v. State, 824 So.2d 1, 13 (Ala.Crim.App.1999) (recognizing that to rise to the level of plain error, an error must have affected the outcome of the trial), overruled on other grounds, Ex parte Carter, 889 So.2d 528 (Ala.2004). That is, the appellant must establish that an alleged error, ' " 'not only seriously affect[ed] [the appellant's] "substantial rights," but ... also ha[d] an unfair prejudicial impact on the jury's deliberations.' " ' Ex parte Brown, 11 So.3d 933, 938 (Ala.2008) (quoting Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002), quoting in turn Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998) ). Only when an error is 'so egregious ... that [it] seriously affects the fairness, integrity or public reputation of judicial proceedings,' will reversal be appropriate under the plain-error doctrine. Ex parte Price, 725 So.2d 1063, 1071-72 (Ala.1998) (internal citations and quotations omitted). Although the 'failure to object does not preclude [appellate] review in a capital case, it does weigh against any claim of prejudice.' Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.1985) (citing Bush v. State, 431 So.2d 563, 565 (1983) ) (emphasis in original). As the United States Supreme Court has noted, the appellant's burden to establish that he is entitled to reversal based on an unpreserved error 'is difficult, "as it should be." '
*701 Puckett v. United States, 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009) (quoting United States v. Dominguez Benitez, 542 U.S. 74, 83, n. 9, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) )."
I.
First, Johnson argues that the prosecutor made several improper statements during his guilt-phase closing argument. Johnson states that the prosecutor improperly argued prejudicial facts that were not in evidence, improperly held himself out to the jury as an expert, and made improper arguments that were calculated to inflame the minds of the jurors. Johnson did not object to any of these allegedly improper statements; therefore, we review these claims for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
In Ferguson v. State, 814 So.2d 925 (Ala.Crim.App.2000), this Court stated:
"This court has stated that '[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.' Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 276, 304 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). 'In judging a prosecutor's closing argument, the standard is whether the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ). 'A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.' Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 5[2] 8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, 'statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.' Bankhead, 585 So.2d at 106. 'Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument.' Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id."
814 So.2d at 945-46.
In Ex parte Brown, 74 So.3d 1039 (Ala.2011), the Alabama Supreme Court stated:
"The United States Supreme Court has stated that, when considering a prosecutor's closing argument, the standard is whether the argument ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ). The argument is to be viewed in its entirety, and, to justify reversal, the argument must have resulted in substantial prejudice *702 to the defendant. Coral v. State, 628 So.2d 954, 985 (Ala.Crim.App.1992)."
74 So.3d at 1051.
Furthermore, " '[t]his court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.' " Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990) (quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985) ).
A.
Johnson contends that, during the prosecutor's rebuttal guilt-phase closing argument, he improperly talked about Officer Davis's putting his eight-month-old baby to bed on the night he died and about Officer Davis's not being able to go home to his family. Specifically, Johnson argues that "no evidence was presented during the trial about Officer Davis having a baby at home or about him putting his baby to bed before his death." Johnson's brief, at 34-35. Johnson does not explain with any degree of specificity how he was prejudiced by the prosecutor's comments.
At the beginning of the prosecutor's rebuttal closing argument, he stated:
"The state represents the point of view of Philip Davis. I want to tell you a couple of things before I start. One, the night Philip Davis died, just before he walked to his car to drive to his patrol unit he put his eight-month-old baby to bed. Philip Davis cannot be forgotten. This trial is about how he lost his life. He lost his life standing for me and everybody in this society doing what he is asked to do."
(R. 1970-71.) Later in his rebuttal closing argument, the prosecutor stated:
"Once again, murder doesn't make sense. I've never known it to.
"You want to know why? Why is because [Johnson] decided to.
"You want to know why he shot the police officer? Because he decided to.
"You want to know why Philip Davis can't go home to his family? Because he decided to stop that from happening.
"A clear intentional act. He decided and everybody else pays his tab. You want to know why? That's why. Because he decided to."
(R. 2002.) Finally, the prosecutor concluded his rebuttal closing argument as follows:
"Philip Davis, not as a police officer but as a human being, would like to have gone home to his eight-month-old child and I would like to have seen him do that. He's not going to. He hasn't and he won't because this man right here decided that he wasn't going to. Thank you."
(R. 2004.) The defense did not object to any of these comments.
During the prosecutor's rebuttal closing argument, the trial court instructed the jury: "Ladies and gentlemen, you've heard the facts and that's what you are to take is what you've heard. This is just argument of counsel." (R. 1998.) Then, during the trial court's instructions to the jurors before they began their deliberations, the trial court stated: "You are to base your verdicts in this trial upon the evidence, the evidence that you've heard in this trial in the form of live testimony, the evidence in the form of exhibits." (R. 2034-35.) The trial court also instructed the jury: "You are not to consider [as] evidence in this case the arguments of the attorneys in this case." (R. 2035.) Further, the trial court instructed the jurors that they "should base [their] verdict upon the evidence and *703 not on speculation, conjecture, sympathy or emotion." (R. 2035.)
It is true that no evidence was presented during the guilt phase concerning Officer Davis's child. However, considering that the defense failed to object to these comments and that the trial court specifically instructed the jury that argument of counsel was not evidence, we fail to see how the prosecutor's passing comments concerning Officer Davis's child " ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' " Ferguson, 814 So.2d at 945. In the context of the prosecutor's entire lengthy closing argument, the complained-of comments were incidental, and they do not appear to be calculated to inflame the jury. Also, the evidence against Johnson was overwhelming. Furthermore, as the Alabama Supreme Court has recognized in the context of victim-impact testimony:
"It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [the defendant] did not receive a fair trial simply because the jurors were told what they probably had already suspected-that [the victim] was not a 'human island,' but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991) )."
Ex parte Rieber, 663 So.2d 999, 1006 (Ala.1995).
In the present case, the jurors probably already suspected that Officer Davis was not a "human island," but a unique individual with a family, and the jurors obviously knew that Officer Davis would no longer be able to interact with his family after his death. Further, it would not surprise a rational juror to hear that someone around the age of Officer Davis had a family that included a young child, because such a situation is very common. We agree with the Ohio Supreme Court that "[m]erely mentioning the personal situation of the victim's family, without more, does not constitute [prosecutorial] misconduct." State v. Goodwin, 84 Ohio St.3d 331, 339, 703 N.E.2d 1251, 1260 (1999) ; see also Lovejoy v. State, 244 Ala. 637, 637, 15 So.2d 303, 303 (1943) (holding that "the mere admission of evidence of the number of children left by deceased, or their ages, without more, should not work a reversal in a homicide case").
In the cases on which Johnson relies to support his contention, the prosecutor made statements that the appellate courts specifically found were "calculated to inflame the minds of the jury." Lowman v. State, 38 Ala.App. 612, 614, 91 So.2d 697, 699 (1956) ; see also Thomas v. State, 18 Ala.App. 268, 271, 90 So. 878, 880 (1921) (prosecutor's statements were "calculated to engender unduly the sympathies of the jury on the one hand, or to inflame their minds with prejudice and passion upon the other hand"); Rogers v. State, 275 Ala. 588, 593, 157 So.2d 13, 17-18 (1963) (same); Arthur v. State, 575 So.2d 1165, 1184-85 (Ala.Crim.App.1990) (same). We find no such calculation in the prosecutor's statements in the present case.
Furthermore, "[i]t is well settled that jurors are presumed to follow, not disregard, the trial court's instructions." Brooks v. State, 973 So.2d 380, 409 (Ala.Crim.App.2007). Therefore, with no reason to believe otherwise, we must presume that the jurors followed the trial court's instructions to not consider the attorneys'
*704 arguments as evidence and to not allow speculation or emotion to influence their decisions.
Accordingly, viewing the prosecutor's unobjected-to comments " 'in the context of all of the evidence presented and in the context of the complete closing arguments to the jury,' " Ferguson, 814 So.2d at 945, and considering the trial court's instructions to the jury, we hold that Johnson has failed to demonstrate that the prosecutor's comments " ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' " Ex parte Brown, 74 So.3d at 1051. Thus, Johnson has failed to show that the trial court's failure to exclude the prosecutor's comments constituted error, much less plain error.
B.
Johnson also argues that, during his rebuttal guilt-phase closing argument, the prosecutor improperly stated that, if Johnson had received a speeding ticket from Officer Davis, Johnson would have lost his driver's license and possibly his job because it required some travel. Specifically, Johnson states that "[t]his was another assertion of facts not in evidence because there was no evidence that Mr. Johnson was in danger of losing his driver's license or his job." Johnson's brief, at 36.
During the prosecutor's rebuttal guilt-phase closing argument, he stated:
"Guys, this is [Johnson's] nineteenth speeding ticket. You want to know why? The law doesn't require the State to tell you why, a motive. The judge is going to tell you that. Why? Because there is so many reasons that people behave the way they behave, they choose to engage in the conduct they choose to engage in.
"I've had people shoot people on the interstate called road rage. I've had men stab one another over an insult. Why people kill people doesn't make sense. It rarely ever makes sense. You can make sense out of a drug killing or something along that line, but the vast majority don't make sense. Killing people over insults don't make sense and it happens every day. Murder doesn't make sense.
"But there is something here. He's about to get his nineteenth speeding ticket and that speeding ticket is going to cost him his license, which may cost him the opportunity for his job. Okay."
(R. 1975-76.) Later, the prosecutor stated:
"Guys, I'm going to tell you that based on this evidence that in my opinion had [Officer Davis] said, 'Oh, your brother is a cop, well, maybe I can just give you a warning ticket,' that he would have never been shot. He is shot for the nineteenth ticket, the next man coming, the next police officer. He is shot for being in this position at that time.
"You want to know why. Murder don't make sense, guys. Killing people don't make sense. There are so many times I've seen it that it didn't make sense, that you just don't ask why always and get a clear-cut answer. The psychiatrist just finished telling you that.
"I can't tell you why he did what he did, but what I can tell you is there is no psychological disorder that led to it."
(R. 1987.) Near the end of the prosecutor's rebuttal guilt-phase closing argument, he stated:
"In a few minutes [after the shooting Johnson] is going to talk to his brother and one of the first questions is going to say is, 'Did you get another ticket because I was on the phone when you were getting stopped?' And the one of the *705 most striking responses I've ever heard in a case is, 'Nope, not this time.'
"What that tells you-it's a callus statement, yes. It also tells you, 'I know what I've done and I know what I'm going to do about it. I know the course of conduct that I'm about to engage in and that is to escape.' 'No, not this time.'
"It also tells you something about why. 'I'm not getting my nineteenth ticket, not this time.' "
(R. 1992-93.) The defense did not object to any of these comments.
During the guilt phase of the trial, the jury was presented with evidence indicating that Johnson had received 18 speeding tickets between September 26, 1996, and October 20, 2009. (C. 512.)[1] Under Alabama law, the Department of Public Safety can suspend a driver's license if the driver is assessed 12 or more points for certain enumerated offenses during a 2-year period, and drivers are assessed 2 points for each speeding violation that is less than 26 miles per hour over the speed limit. See § 32-5A-195, Ala.Code 1975; see also Rule 760-X-1-.07, Ala. Admin. Code (Dep't of Pub. Safety). Therefore, the Department of Public Safety can suspend a driver's license if the driver receives six speeding tickets in a two-year period. In the present case, there was evidence indicating that Johnson had received significantly more than six speeding tickets, but the specific date when he received each individual ticket was not introduced into evidence during the guilt phase of trial.
The only testimony concerning the possible suspension of Johnson's license came from the defense's expert, Dr. Golden. Dr. Golden testified:
"[Defense counsel]: Now, we are dealing with irrationality here, Dr. Golden. Is it rational to you that this incident may have happened because he was just tired of getting too many speeding tickets?
"[Dr. Golden]: No, I don't think so. I had talked about this with Bart. Initially he actually didn't say this. Part of this conversation comes out of the conversation I had with him earlier about what his reaction to the speeding tickets were and whether they bothered him because I was examining that theory that somehow getting another speeding ticket, you know, maybe his license would be suspended for life because they have so many-something about it that made this speeding ticket different from all the other tickets. And he came to that, you know, he didn't like getting stopped by police officers-I don't think any of us actually like being stopped for speeding-but that this wasn't anything special, as far as he could identify or recall. It didn't have any special meaning. So, attacking the officer just to avoid getting a ticket would make no rational sense. And then attacking him after the ticket had already been recorded and written makes even less sense."
(R. 1712-13.)
This Court has stated that "[a] prosecutor may argue every legitimate inference from the evidence 'and may examine, collate, [sift] and treat the evidence in his own way.' " Woodward v. State, 123 So.3d 989, 1028 (Ala.Crim.App.2011) (quoting Taylor v. State, 666 So.2d 36, 64 (Ala.Crim.App.1994) ). In Jones v. State, 456 So.2d 366 (Ala.Crim.App.1983), this Court stated:
*706 "In order for unsupported prosecutorial statements of fact to require reversal, the objectionable statements must be (1) made as of fact, (2) without support by any evidence, (3) pertinent to the issues, and (4) have a natural tendency to influence the finding of the jury."
456 So.2d at 375. Furthermore, " 'counsel should have wide latitude in arguing reasonable inferences from the evidence.' " Lane v. State, 169 So.3d 1076, 1123 (Ala.Crim.App.2013) (quoting Jones, 456 So.2d at 374 ).
In the present case, during his rebuttal closing argument, the prosecutor explicitly stated: "I can't tell you why [Johnson] did what he did." The prosecutor also emphasized that "murder doesn't make sense" and that it was not necessary for the jury to find a motive in order to convict Johnson of capital murder. Nevertheless, the prosecutor suggested that one possible motive for the shooting was the possibility that Johnson could lose his license, which was a subject that had been raised by the testimony of Dr. Golden. Based on the evidence that was before the jury, it was within the realm of possibility that Johnson's license could have been suspended if he received a speeding ticket from Officer Davis. The evidence before the jury was that Johnson had received 18 speeding tickets over the 13-year period immediately preceding the incident involving Officer Davis; thus, it was possible that Johnson could have received 5 speeding tickets during the 2-year period immediately before the incident involving Officer Davis. It is simply not true to state that there was no evidence indicating that Johnson could lose his license if he received a speeding ticket from Officer Davis. Also, concerning the prosecutor's statement that, if Johnson lost his license, it "may cost him the opportunity for his job," we note that there was evidence indicating that Johnson's job required travel; thus, it was a legitimate inference to argue that, if Johnson lost his license, it might affect his job. Therefore, considering that a prosecutor may argue every legitimate inference from the evidence and that counsel should be given wide latitude in making such arguments, we hold that the prosecutor's unobjected-to comments did not constitute error, much less plain error.
C.
Next, Johnson contends that the prosecutor improperly argued a fact not in evidence when he stated that Johnson admitted to shooting Officer Davis. During the prosecutor's rebuttal guilt-phase closing argument, he stated:
"Did [Johnson] decide to do that on purpose when he did it? You bet you. He reached over and got a gun and put it in his face and pulled the trigger. He knew exactly what he was doing and did do that. I'm not the one who is saying that. He said that. He admits to doing that.
"We can show you the picture of him doing it, but he's not saying he didn't do that. He intentionally picked up a gun, stuck it out the window, put it in a man's face and pulled the trigger. He intentionally did that."
(R. 1976-77.) The defense did not object to these comments.
At trial, there was evidence indicating that, a couple of hours after the shooting, as Johnson was being taken into custody, he stated: "Hey, man, I'm your guy. I'm the one you're looking for." Also, Johnson's expert testified that Johnson saw the video of the shooting and then "basically said, well, I guess this must have happened, this must have been what happened, or these things happened." (R. 1637.) Johnson's expert was also asked *707 whether Johnson cognitively accepts that he caused Officer Davis's death, and Johnson's expert responded: "We told him he did it. We showed him the video. We said, 'It was you. You did it.' He seems to have come to a-he has accepted that." (R. 1725.) Furthermore, before trial, Johnson informed the trial court that he would not proceed on his plea of not guilty and that he would proceed solely on the theory that he was not guilty by reason of mental disease or defect at the time of the offense.
According to Johnson, the prosecutor's comments were improper because "there was no testimony at trial that [Johnson] confessed, nor was there testimony that he said he knew what he was doing." Johnson's brief, at 38. However, the prosecutor did not say that Johnson confessed to anything concerning his mental state at the time of the offense. Read in context, the prosecutor was saying that Johnson did not deny being the person who "reached over and got a gun and put it in [Officer Davis's] face and pulled the trigger." That remark is consistent with the evidence and with Johnson's plea. Therefore, viewed in the context of the entire closing argument, we cannot say that the prosecutor's comments " ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process" ' " or that the comments "resulted in substantial prejudice to the defendant." Ex parte Brown, 74 So.3d at 1051. Thus, we hold that the prosecutor's comments do not constitute error, much less plain error.
D.
Next, Johnson contends that the prosecutor improperly expressed his personal beliefs and presented himself as an expert.
This Court has stated:
" ' "While it is never proper for the prosecutor to express his personal opinion as to the guilt of the accused during closing argument, reversible error does not occur when the argument complained of constitutes mere expression of opinion concerning inferences, deductions and conclusions drawn from the evidence." '
" Allen v. State, 659 So.2d 135, 139 (Ala.Crim.App.1994) (quoting Sams v. State, 506 So.2d 1027, 1029 (Ala.1986) ).
" ' "A prosecutor as well as defense counsel has a right to present his impressions from the evidence," and "[h]e may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way." Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App.1980), writ denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981).'
" Henderson v. State, 584 So.2d 841, 856-57 (Ala.Crim.App.1988)."
Brown v. State, 74 So.3d 984, 1017 (Ala.Crim.App.2010), aff'd, 74 So.3d 1039 (Ala.2011).
Furthermore, in McGowan v. State, 990 So.2d 931 (Ala.Crim.App.2003), this Court stated:
" ' " '[T]he rule on which the weight of authority is in agreement is that it is improper for the prosecuting attorney ... to express his personal opinion or belief in guilt of accused [so] as to permit an inference by the jury that such opinion or belief is based on reasons or information outside the evidence, but that it is not improper for him to argue or to express his opinion that accused is guilty, where he states, or it is apparent, that such opinion is based solely on the evidence.'
*708 23A C.J.S. Criminal Law § 1104, p. 194-95 (1961). See Crenshaw v. State, 153 Ala. 5, 7, 45 So. 631, 632 (1908) (prosecutor argued to the effect that the evidence showed a clear case); Cranmore v. State, 41 Ala.App. 276, 279, 129 So.2d 121, 123 (1961) (prosecutor's statement, 'I never did ask you to convict a man I believe to be innocent' found to be 'a mere expression of opinion by the solicitor that the defendant was guilty, and ... not a cause for reversal'); Handley v. State, 214 Ala. 172, 175, 106 So. 692, 695 (1925) (argument, 'She is a murderer; she is a murderer. She is not some one who has committed some of the lower offenses of homicide' did 'not transcend the bounds of legitimate argument'); Gardner v. State, 17 Ala.App. 589, 590-91, 87 So. 885, 886, cert. denied, 205 Ala. 60, 87 So. 888 (1920) (prosecutor's argument that the defendant 'is a pickpocket' in prosecution for grand larceny 'was the expression of an opinion' by the prosecutor, 'and from the state's contention was supported by one phase of the evidence.' Presiding Judge Bricken dissented, arguing that 'it did not lie in the mouth of the solicitor to decide these vital questions.'); McColston v. State, 20 Ala.App. 591, 593, 104 So. 347, 348-49 (1925) (prosecutor's argument, 'He is guilty of the crime of highway robbery,' should be refrained from but did not constitute error); Dunn v. State, 19 Ala.App. 576, 577, 99 So. 154, 155 (1924) (prosecutor's comment, 'I tell you that this defendant is guilty,' was merely an argument of the inference drawn by the solicitor and was not improper); Griggs v. State, 21 Ala.App. 530, 531, 109 So. 611 (1926) (prosecutor stated that from the evidence he believed the defendant was guilty, and that, if he did not believe the defendant was guilty, he would not ask the jury to convict him. Held: The opinion was based upon the evidence. 'Where this is the case, such expression of opinion will not be sufficient upon which to predicate a reversal.'); Tucker v. State, 28 Ala.App. 492, 494, 188 So. 276, 277 (1939) (prosecutor's statement, 'I believe he [defendant] is guilty' was a 'mere expression of opinion by the solicitor' and not improper remark); Gilbert v. State, 19 Ala.App. 104, 106-07, 95 So. 502, 504 (1923) (prosecutor's closing argument, 'He is guilty as hell itself under this testimony, and you know it' though not approved was 'but the mere expression of counsel made in argument')."
" ' Galloway v. State, 484 So.2d 1199, 1201 (Ala.Cr.App.1986).'
" Hunt v. State, 659 So.2d 933, 940-42 (Ala.Crim.App.1994) (holding that the following comments by the prosecutor were not error: that he felt that the evidence presented was ' "overwhelming," ' that ' "at the conclusion of this trial ... you will agree with the State of Alabama that the defendant is guilty of capital murder," ' and that ' "if this isn't capital murder, then there has never been capital murder in Walker County" '), aff'd, 659 So.2d 960 (Ala.1995)."
990 So.2d at 971-72.
To support his contention, Johnson cites the following comments that were made by the prosecutor during his rebuttal guilt-phase closing argument:
"Guys, if you don't believe [Johnson] intentionally did that from this evidence, then vote not guilty. That is your job. There is no question. There is no question in your mind or my mind or anybody *709 in this courtroom's mind, not even in the defendant's mind. He knows he did that. He picked up a gun, put it in a man's face and killed him right there on the side of the road and you watched him die and I did."
(R. 1977-78.)
"Guys, I'm going to tell you that based on this evidence that in my opinion had [Officer Davis] said, 'Oh, your brother is a cop, well, maybe I can just give you a warning ticket,' that he would have never been shot. He is shot for the nineteenth ticket, the next man coming, the next police officer. He is shot for being in this position at that time.
"You want to know why. Murder don't make sense, guys. Killing people don't make sense. There are so many times I've seen it that it didn't make sense, that you just don't ask why always and get a clear-cut answer. The psychiatrist just finished telling you that.
"I can't tell you why [Johnson] did what he did, but what I can tell you is there is no psychological disorder that led to it."
(R. 1987.)
"In a few minutes [after the shooting Johnson] is going to talk to his brother and one of the first questions is going to say is, 'Did you get another ticket because I was on the phone when you were getting stopped?' And the one of the most striking responses I've ever heard in a case is, 'Nope, not this time.'
"What that tells you-it's a callus statement, yes. It also tells you, 'I know what I've done and I know what I'm going to do about it. I know the course of conduct that I'm about to engage in and that is to escape.' 'No, not this time.'
"It also tells you something about why. 'I'm not getting my nineteenth ticket, not this time.' "
(R. 1992-93.)
"But what struck me about that was that [Johnson] could tell the psychiatrist the route that he took. He could tell him the roads that he crossed to get here.
"Guys, I went out there and I can't get myself back. But he knew the roads that he crossed to get there. More importantly, he starts-when he gets out there, he has to start by talking to his brother. A number of telephone calls-eight, I think-between him and his brother back and forth, thirty seconds or so a piece, and he's telling his brother how to get there.
"Now, what does that tell you? It tells you clearly that he understands where he is, that he's oriented to time and space, that he knows what he is doing, that he is able to give incremental directions to his brother on how to make a turn of where to get to this particular place where I am."
(R. 1993-94.)
"But [Story] looks outside and she watches [Johnson] get into a grey pickup that belongs to his brother, the brother that he has had to give very distinct directions on how to get off the freeway, exactly where to turn, exactly what roads to come down, exactly how to get to exactly where he is to pick him up in the darkness where he is hiding.
"Guys, does that sound like somebody to you that doesn't have a handle on what they are doing? Sounds to me like a man who knows exactly what he is doing and still wants desperately not to take responsibility for killing another human being. And he, in fact, does just exactly that. He directs his brother to *710 where he is and his brother comes and picks him up."
(R. 1994-95.)
"That's what I think the facts say that [Johnson and his brother] had in mind." (R. 1999.)
Johnson further cites the following comment made by the prosecutor during his explanation of the prosecution's theory that Johnson was attempting to flee to somewhere south of Birmingham with his brother after the shooting:
"You see, because here is what can happen easily in this case, the very first night-and I was on the scene at this case within an hour and a half or so myself. The very first words out of my mouth are, 'We are going to get a stolen car claim. Are we going to have an identity issue? We don't have an issue of what happened, are we going to have an identity issue.' "
(R. 1998.)
Johnson also cites comments by the prosecutor pointing out that the police officers who testified at trial were not wearing their service weapons. The prosecutor stated that he was the one who told the officers not to wear their guns and that he was criticized for doing so because police officers "don't like to be without [their gun]." (R. 1996.) The prosecutor explained:
"Here is the point. Bill Johnson got in that truck, had been a long-time police officer, and didn't bring his gun. Here is what that tells me, that they've got an idea about getting away. But he knows better-he knows better than to have a gun with him and face the police that are looking for them. So, he don't wear his gun, even though every police officer I know would have their gun with them. He doesn't."
(R. 1996-97.)
Johnson further argues that the prosecutor "inject[ed] his own beliefs into the closing arguments" with the following three comments near the end of his rebuttal guilt-phase closing argument. Johnson's brief, at 42. First, Johnson cites the prosecutor's statement that "[t]hat's what I think the facts say that [Johnson and his brother] had in mind." (R. 1999.) Next, Johnson cites the prosecutor's statement that, "[g]uys, that is my best judgment about the facts in this case and what actually happens with the facts." (R. 2001.) Finally, Johnson cites the prosecutor's statement that, "[o]nce again, murder doesn't make sense. I've never known it to." (R. 2002.) The defense did not object to any of the above-referenced comments cited by Johnson.
Viewing the prosecutor's comments in context, we conclude that they were simply permissible comments about Johnson's guilt that were based on the evidence. The prosecutor did not encourage the jury to convict Johnson based on information outside the evidence, and the prosecutor's comments would not permit an inference by the jury that his beliefs are based on information outside the evidence. Furthermore, as the United States Court of Appeals for the Fourth Circuit has stated, "a prosecutor's 'use [of] the phrase "I think" in an innocuous, conversational sense' does not violate due process because such use 'do[es] not suggest an attempt to replace the evidence with the prosecutor's personal judgments.' " United States v. Higgs, 353 F.3d 281, 332 (4th Cir.2003) (quoting United States v. Adam, 70 F.3d 776, 780 (4th Cir.1995) ). In the present case, the prosecutor's innocuous use of phrases such as "in my opinion," "sounds to me like," "that is my best judgment,"
*711 and "I think" did not violate due process. Every time the prosecutor phrased a statement in the form of an opinion, the statement was directly related to the evidence that was presented at trial. Additionally, we again note that the trial court instructed the jurors that they "are not to consider [as] evidence in this case the arguments of the attorneys in this case" and that they "should base [their] verdict upon the evidence and not on speculation, conjecture, sympathy or emotion." (R. 2035.) Therefore, viewing the prosecutor's unobjected-to comments in the context of the entire closing argument and considering the trial court's instructions, we cannot say that the prosecutor's comments " ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process" ' " or that the comments "resulted in substantial prejudice to the defendant." Ex parte Brown, 74 So.3d at 1051. Accordingly, we hold that there was not any plain error.
E.
Next, Johnson argues that the prosecutor committed prosecutorial misconduct during his closing argument by falsely stating that Johnson did not have a sister. One of the expert reports admitted into evidence at trial revealed that Johnson has a half sister. (C. 508.)
During the prosecutor's rebuttal guilt-phase closing argument, he stated:
"Now, what has to happen? At this point, in that truck, if [Johnson and his brother] can get anywhere south of the accident all they have to say is, 'Hey, look, I found my brother asleep on the couch in Clanton with my sister'-he doesn't have a sister. I don't know where they were planning to go, but it was somewhere down that way. That's what he tells Grant, 'I'm going to Clanton.'
"Actually, ladies and gentlemen, what Grant said was 'Clanton or Calera.' I can't remember which. Those were his words, 'Clanton or Calera is what he told me and I told him come to Tarrant.'
"Here is what happens, guys. If they get there and this shirt with blood on it disappears and the gun in the truck disappears, we've got nothing. All he's got to say is 'my car was stolen and my billfold was in it. So, whoever shot that police officer had my driver's license and he gave that driver's license to the police officer, and all the information on that ticket came from that driver's license.' That's what works. That's what they had in mind. That's what I think the facts say that they had in mind."
(R. 1998-99) (emphasis added). The defense did not object to this statement.
The Alabama Supreme Court has stated: "Counsel should not be permitted to state as fact that which is damaging to defendant, and of which there is no legal proof." Rogers v. State, 275 Ala. at 593, 157 So.2d at 17.
In the present case, because there was undisputed evidence indicating that Johnson has a half sister, the prosecutor's passing remark that Johnson does not have a sister could be construed as a misstatement of a fact. However, there is no indication that that misstatement prejudiced or damaged Johnson in any way. The prosecution's argument was that Johnson and his brother were attempting to flee to a location south of Birmingham after the shooting in an effort to create an alibi. It is irrelevant whether that location was Johnson's sister's house or some other place south of Birmingham. Further, Officer Grant's testimony was that, during his telephone conversation with Johnson's brother after the shooting, Johnson's brother stated that "he hadn't been able to get in contact with his brother, that he had *712 talked to his sister and his sister advised that his brother had been staying down there, living on her couch." (R. 1390.) That statement makes little sense as an attempt to create an alibi if Johnson does not actually have a sister; accordingly, the prosecution's theory that that statement was an attempt to create an alibi makes little sense if Johnson does not have a sister. Therefore, there is no indication that the prosecutor's passing misstatement caused Johnson any prejudice. If anything, the misstatement hurt the prosecution's argument. Furthermore, again, the trial court instructed the jurors that they could not consider the attorneys' arguments as evidence, and we presume that the jurors followed those instructions. Consequently, we cannot say that the prosecutor's unobjected-to comment " ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process" ' " or that the comment "resulted in substantial prejudice to the defendant." See Ex parte Brown, 74 So.3d at 1051. Thus, we hold that the prosecutor's comment does not constitute plain error.
F.
Johnson also states that the cumulative effect of the alleged prosecutorial misconduct denied him a fair trial. We have considered each of the allegations of prosecutorial misconduct individually and have held that none of the allegations require reversal. After reviewing the record and considering the allegations of prosecutorial misconduct cumulatively, this Court further holds that the cumulative effect of any alleged errors did not probably injuriously affect Johnson's substantial rights and, thus, does not require reversal. See Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (stating that "[t]he correct rule is that, while, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, [Ala. R.App. P.,] if the accumulated errors have 'probably injuriously affected substantial rights of the parties,' then the cumulative effect of the errors may require reversal"). Therefore, this claim is without merit.
II.
Next, Johnson argues that the prosecutor made several improper statements during his opening and closing statements in the penalty phase of the trial. As with the statements challenged in Part I, Johnson contends that the prosecutor improperly argued prejudicial facts that were not in evidence, improperly held himself out to the jury as an expert, and made improper arguments that were calculated to inflame the minds of the jurors. Johnson did not object to any of these allegedly improper statements; therefore, we review these claims for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
" ' "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden v. Wainwright, 699 F.2d [1031] at 1036 [ (11th Cir.1983) ]. The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).' "
Thompson v. State, 153 So.3d 84, 170 (Ala.Crim.App.2012) (quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) ).
A.
Johnson argues that the following statements by the prosecutor during his penalty-phase opening statement were improper:
*713 "I've been on a lot of crime scenes in my life. It's what I've made my living doing. I remember seeing a flag that said, 'They rush in where angels fear to tread.' I know you've heard me say and it's what [police officers] do.
"....
"They do it on a different level. They are willing to put at risk their own lives under any circumstance that may exist just to have the right to make this a better place. It's not their job, it's their choice. They choose to serve and they choose to protect. They choose to see that you and I can go home safely at night. They choose to take the risk that is involved with those circumstances. I've watched it personally. I've been there and I've seen the dedication that they offer."
(R. 2052-54.)
The defense did not object to these comments. On appeal, Johnson does not explain how he was prejudiced by these comments. After reviewing these comments in context, we are confident that they did not " ' "so infect the [proceedings] with unfairness" ' " as to make the jury's sentencing recommendation a denial of due process. Thompson, 153 So.3d at 171. Therefore, this claim is without merit.
Johnson also asserts that the following statement by the prosecutor during his penalty-phase opening statement was improper because, Johnson says, "it implies the entire government supports the death penalty." Johnson's brief, at 47.
"What I will tell you is simply the same thing that we said from the beginning, and it's the thing that I have had to make my life doing. There are circumstances in every criminal case-regardless of what the charge is, there are circumstances which say we should be awarding the minimum punishment in this particular case and there are circumstances which, on the other hand, say that we should be awarding the maximum sentence on a particular case.
"The choice will be for you to make that recommendation. We've made our choice. We are going to ask you to recommend the death penalty for this particular case, because one who chose to risk all for us was given that requirement."
(R. 2056-57.) The defense did not object to these comments.
In Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009), this Court stated:
"In our adversarial system of criminal justice, a prosecutor seeking a sentence of death may properly argue to the jury that a death sentence is appropriate. See Hall v. State, 820 So.2d 113, 143 (Ala.Crim.App.1999). On the other hand, it is impermissible for a prosecutor to urge the jury to ignore its penalty-phase role and simply rely on the fact that the State has already determined that death is the appropriate sentence. See Guthrie [v. State ], 616 So.2d [914,] 931-32 [ (Ala.Crim.App.1993) ] (holding that a prosecutor's statement that ' "[w]hen I first became involved in this case, from the very day, the State of Alabama, the law enforcement agencies and everybody agreed that this was a death penalty case, and we still stand on that position" ' improperly '[led] the jury to believe that the whole governmental establishment had already determined that the sentence should be death and [invited] the jury to adopt the conclusion of others, ostensibly more qualified to make the determination, rather than deciding on its own')."
74 So.3d at 91.
In the present case, viewing the prosecutor's comments in context, we find that the prosecutor simply argued that the *714 death sentence was appropriate in this particular case. The prosecutor did not urge the jury to ignore its penalty-phase role and simply rely on the fact that the State had already determined that death is the appropriate sentence. In fact, the prosecutor made clear that, although the prosecution was asking for the death penalty, the sentencing-recommendation "choice" belonged to the jury. Contrary to Johnson's argument, nothing in the prosecutor's comments would lead the jury to believe that the whole governmental establishment had already determined that the sentence should be death. Therefore, there was nothing improper about the prosecutor's comments, and we conclude that Johnson's claim is without merit.
B.
Next, Johnson contends that the prosecutor made improper references to Officer Davis's family members during the prosecutor's penalty-phase closing argument. To support his contention, Johnson cites the following comments:
"All [Johnson] had to do was sign this ticket. One signature and he could have driven home to his family and Philip Davis would have gone home to his family the next morning. But that's not how it happened.
"This case is about Philip Davis. It is about his life and his death, but it's about society and it's about keeping order in society. It's about people who raise their hand and swear to uphold the law, and, as [the prosecutor who delivered the opening statement] put it, the people who rush in when we rush out. That's what this case is about.
"We've heard a lot about Bart Johnson and we've heard a little about Philip Davis. We have heard a lot about how (snaps finger) just that quickly a traffic stop went bad. We've heard about how we went from this to this (indicating) and a gun in somebody's face.
"Ten days ago you came in here and we talked to you a lot about the death penalty and how you felt. A lot of people without exception said, 'I don't know. I've never had an occasion to think about it.' That may seem like a long time ago now.
"[Officer Davis's wife] probably never thought about it really either, but now she lives it. She told you about it. She smiled. She talked about fond memories. She talked about the laughter that is no longer in her house. She talked about [her and Officer Davis's children]. And she talked about the night of December 3rd, 2009.
"Philip and [his wife] aren't seeing the world together. [His children] aren't getting put to bed by their dad anymore. The house is quiet."
(R. 2178-79.) Shortly thereafter, the prosecutor stated:
"You've had a lot to consider. You've considered it carefully and you've considered it thoughtfully. We are going to ask you to once again consider what you've heard and what you've seen, the emotional and those things that aren't emotional. This is about the law. This is about the law and what you must do as jurors about the law.
"[Officer Davis's children] can't send an I-love-you-daddy video to Philip Davis.
"Remember our passionate servant who died doing his job as a sworn officer on a dark night on December 3rd, 2009."
(R. 2181-82.) The defense did not object to any of these comments.
Immediately before the jurors began their penalty-phase deliberations, the trial court instructed them:
*715 "In reaching your findings concerning aggravating and mitigating circumstance in a case and in determining what to recommend punishment in the case, you must avoid any influence of passion, prejudice or any other arbitrary factor. Your deliberations and verdict should be based on what you've seen and heard and the law that I instructed you on. There is no room for the influence of passion, prejudice or any other arbitrary factors in either case."
(R. 2218.)
This Court has stated:
" 'The prosecutor [may] properly comment on the victim's lost roles as a family member and a friend during closing arguments at the sentencing phase of the trial.' Smith v. State, 838 So.2d 413, 458 (Ala.Crim.App.2002). Nonetheless, '[t]he State should not encourage the jury to impose the death penalty out of sympathy for the victims. Le [v. State ], 947 P.2d [535] at 554 [ (Okla.1997) ]. While such comments are not to be condoned, we do not believe the comments in the present case were so grossly improper to warrant reversal or modification.' Warner v. State, 144 P.3d 838, 891 (Okla.Crim.App.2006)."
Thompson, 153 So.3d at 171.
Furthermore,
" '[i]n Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court held:
" ' "[A] State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. '[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' Booth [v. Maryland ], 482 U.S. [496, 517, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) ] (White, J., dissenting) (citation omitted). By turning the victim into a 'faceless stranger at the penalty phase of a capital trial,' [ South Carolina v.] Gathers, 490 U.S. [805, 821, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989) ] (O'Connor, dissenting), Booth deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder."
" ' 501 U.S. at 825, 111 S.Ct. 2597. The Supreme Court further stated:
" ' "We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated."
" ' Payne, 501 U.S. at 827, 111 S.Ct. 2597. The Supreme Court recognized that victim-impact evidence "is designed to show instead each victim's 'uniqueness as an individual human being,' whatever the jury might think the loss to the community resulting from his death might be." Payne, 501 U.S. at 823, 111 S.Ct. 2597.'
*716 " Woods v. State, 13 So.3d 1, 35 (Ala.Crim.App.2007)."
McMillan v. State, 139 So.3d 184, 238-39 (Ala.Crim.App.2010).
In the present case, the prosecutor simply commented on Officer Davis's lost roles as a family member. Such comments are permissible. The prosecutor never encouraged the jury to impose the death penalty out of sympathy for Officer Davis. The prosecutor's arguments were used to rebut mitigating evidence presented by Johnson concerning his uniqueness as an individual human being. This Court holds that the prosecutor's argument did not " ' "so infect the [proceedings] with unfairness" ' " that Johnson was denied due process. Thompson, 153 So.3d at 171. Furthermore, we presume that the jury followed the trial court's instruction to avoid any influence of passion or other arbitrary factor in determining what punishment to recommend in this case. Therefore, no reversible error occurred.
C.
Next, Johnson contends that the prosecutor engaged in misconduct "by putting his credibility up against that of a witness." Johnson's brief, at 49. Johnson cites the following statements by the prosecutor during his penalty-phase rebuttal closing argument:
"Their expert, Dr. Golden, took an oath, got on that stand and there wasn't anything that came out of his mouth that wasn't fiction and fantasy.
"He asked me if I was mad. Yes, I was mad, ladies and gentlemen. I was angry and I still am because he took an oath to tell you the truth; just as you took an oath last week to listen to the evidence, to listen to the facts and apply the law as the judge will give it to you. He wasn't being fair to you who took that oath. That makes me angry.
"The last thirty-seven years of my life has been spent safeguarding-trying to safeguard the integrity of this court and our judicial system. And when somebody like that gets on the stand and doesn't follow the oath that he swore to tell the truth, it makes me angry."
(R. 2203.) The defense did not object to these comments.
To support his contention, Johnson relies on Davis v. State, 494 So.2d 851 (Ala.Crim.App.1986), and Waldrop v. State, 424 So.2d 1345 (Ala.Crim.App.1982).
In Davis, the prosecutor told the jury that "if you find [the defendant] not guilty, ... you're saying that I'm a liar." 494 So.2d at 856-57. This Court found that that statement improperly "put the prosecutor's own credibility in issue" and that the prosecutor's statement was "a bullying tactic which will result in reversal." Id. at 857.
In Waldrop, the district attorney who prosecuted the case was also the State's principal witness. In stating our reasons for reversing the defendant's conviction on appeal, this Court noted that, "[i]n closing argument, the prosecutor also argued his own credibility to the jury-a practice condemned in State v. McCuistion, 88 N.M. 94, 537 P.2d 702 (1975)." 424 So.2d at 1348.
Those cases are simply inapplicable to the present situation. Though the prosecutor attacked the credibility of Johnson's expert witness, the prosecutor did not testify, nor did he ever put his own credibility in issue. We hold that the prosecutor's comments did not " ' "so infect the [proceedings] with unfairness" ' " that Johnson was denied due process. Thompson, 153 So.3d at 171. Therefore, this claim is without merit.
*717 D.
Next, Johnson contends that, during the prosecutor's penalty-phase rebuttal closing argument, he improperly told the jurors that it was their duty to impose a death sentence. See Ivery v. State, 686 So.2d 495, 510 (Ala.Crim.App.1996) (recognizing that it would have been improper for the prosecutor to tell the jury that "it was its duty to sentence [the defendant] to death"). To support his argument, Johnson cites the following comments by the prosecutor:
"You came through that door almost two weeks ago with another hundred-over a hundred people. You have told us that you could listen to the evidence, that you could apply the law as the judge gives you and that you could be fair.
"Those other people are not here because they told us it would be too tough for them to impose the death penalty if the evidence supported it. Does the evidence support it? You bet it does. Does it demand it? Absolutely.
"We execute people that execute police officers."
(R. 2203-04.) The defense did not object to these comments.
Johnson's interpretation of the prosecutor's comments is strained. The substance of the prosecutor's comments was that the death sentence was appropriate in this particular case. As noted earlier, such an argument is proper. See Vanpelt, supra. Thus, we hold that the prosecutor's comments did not " ' "so infect the [proceedings] with unfairness" ' " that Johnson was denied due process. Thompson, 153 So.3d at 171.
Furthermore,
" ' "[a] prosecutor has the right to fairly ' "reply in kind" ' to statements made by defense counsel in the defense's closing argument." ' Brown v. State, 686 So.2d 385, 396 (Ala.Cr.App.1995), aff'd, 686 So.2d 409 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997), quoting Davis v. State, 494 So.2d 851 (Ala.Cr.App.1986) ; Ex parte Musgrove, 638 So.2d 1360 (Ala.1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (Ala.1994). '[W]ide latitude is usually given regarding replies in kind.' Blackmon v. State, 574 So.2d 1037 (Ala.Cr.App.1990) (citations omitted)."
Simmons v. State, 797 So.2d 1134, 1167 (Ala.Crim.App.1999).
In the present case, during his penalty-phase closing argument, Johnson's counsel stated, among other things:
"We execute the worst of the worst. Ladies and gentlemen, Bart Johnson ain't even close. The crime he committed was awful. But you can't just look at the crime, you've got to look at the totality of the person. And the way I view it is has he led an evil life? What will we accomplish without him being here? Does the whole situation make any sense in this case? No, it don't. Not even a little bit.
"One terrible moment in a life of helping people-and that's what you've got. You've got to say I don't care about that, I'm going to vote for death anyway.
"Well, ladies and gentlemen, you know, when we interviewed you we asked you about an eye for an eye. And if you are sitting here right now and you have that belief, then you shouldn't have been on this jury if you had that belief. You are here because we thought you would be fair to both sides.
"The ones that came in here and said 'I don't care. I'm a macho guy. If he did this, I'm going to kill. That's it and *718 I ain't changing my mind.' Those people aren't on this jury or shouldn't be."
(R. 2200.)
The prosecutor's argument that the death sentence was appropriate in this particular case was a permissible reply in kind to defense counsel's argument that "Bart Johnson ain't even close" to being the type of person who should be executed. Additionally, the prosecutor's statement that people were not on the jury if "they told us it would be too tough for them to impose the death penalty if the evidence supported it" was a permissible reply in kind to defense counsel's statement that people were not on the jury if they stated: "I don't care. I'm a macho guy. If he did this, I'm going to kill. That's it and I ain't changing my mind." Therefore, Johnson's claim that the prosecutor committed misconduct is without merit.
E.
Next, Johnson argues that, during the prosecutor's penalty-phase rebuttal closing argument, he committed misconduct when he stated:
"Does the punishment fit the crime? You bet it does. And too many times I've had to stand before jurors and ask them to come back with the ultimate penalty, but none with the conviction I'm asking you. I'm asking you to return the recommendation that fits the crime, that of death."
(R. 2205.) The defense did not object to this statement.
Johnson argues that this statement violates the rule that prohibits a prosecutor from "imply[ing] to the jury that he or his office had already made the judgment that this case, above most other capital cases, warrants the death penalty." Arthur v. State, 575 So.2d 1165, 1185 (Ala.Crim.App.1990). That rule is essentially the same as the rule mentioned earlier that prohibits a prosecutor from "urg[ing] the jury to ignore its penalty-phase role and simply rely on the fact that the State has already determined that death is the appropriate sentence." Vanpelt, 74 So.3d at 91.
Viewing the prosecutor's statement in the context of the entire closing argument, we conclude that the substance of the prosecutor's statement was that the death sentence was appropriate based on the evidence of the crime that was presented to the jury in this particular case. The prosecutor was not urging the jury to ignore its role and rely on a beforehand determination by the State that death was the appropriate sentence. Thus, the prosecutor did not commit misconduct.
Moreover, during his penalty-phase closing argument, Johnson's counsel argued:
"I've never represented anybody like [Johnson] before. I've never represented anybody like that before. People I usually represent, they were headed down that road. They were eventually going to kill somebody. They were violent guys, career criminals. They were eventually going to kill somebody.
"....
"But in this case, ladies and gentlemen, it is a passion for me to argue for Bart Johnson. This is one we don't execute."
(R. 2199.)
We hold that the prosecutor's statement expressing his view that the death sentence was appropriate in this particular case was a permissible "reply in kind" to Johnson's counsel's statement expressing his view that the death sentence was not appropriate in this particular case. See Simmons, supra. Therefore, the prosecutor's statement was permissible, and Johnson's claim is without merit.
*719 III.
Next, Johnson argues that the trial court made multiple erroneous rulings concerning challenges for cause during jury selection. Specifically, Johnson alleges that the trial court erroneously refused to strike prospective jurors who would automatically vote for the death penalty, that the trial court erroneously struck prospective jurors who disfavored the death penalty but would not automatically vote against it, that the trial court erroneously refused to strike prospective jurors who already believed Johnson was guilty, and that the trial court erroneously refused to strike prospective jurors who would not consider an insanity defense.
Initially, we note that Johnson argues that the trial court erroneously refused to strike 21 prospective jurors for cause. However, only one of those prospective jurors, J.C.,[2] ultimately served on the jury. "[T]he Alabama Supreme Court has held that the failure to remove a juror for cause is harmless when that juror is removed by the use of a peremptory strike. Bethea v. Springhill Mem'l Hosp., 833 So.2d 1 (Ala.2002)." Pace v. State, 904 So.2d 331, 341 (Ala.Crim.App.2003). Even so, the Alabama Supreme Court has also held that the failure to remove a prospective juror for cause who is later removed by the use of a peremptory strike might not be harmless when multiple erroneous rulings on challenges for cause are involved and the jury includes jurors who would likely have been the subject of peremptory strikes had such strikes been available. Ex parte Colby, 41 So.3d 1 (Ala.2009). Thus, we will review each of Johnson's claims individually.
This Court has stated:
" 'To justify a challenge for cause, there must be a proper statutory ground or " 'some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.' " Clark v. State, 621 So.2d 309, 321 (Ala.Cr.App.1992) (quoting Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App.1983) ). This Court has held that "once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions" about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala.1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995). A juror "need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it." Kinder v. State, 515 So.2d 55, 61 (Ala.Cr.App.1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. Kinder, at 60-61. In order to justify disqualification, a juror " 'must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused' "; " '[s]uch opinion must be so fixed ... that it would bias the verdict a juror would be required to render.' " Oryang v. State, 642 So.2d 979, 987 (Ala.Cr.App.1993) (quoting Siebert v. State, 562 So.2d 586, 595 (Ala.Cr.App.1989) ).'
*720 " Ex parte Davis, 718 So.2d 1166, 1171-72 (Ala.1998).
" 'A trial judge is in a decidedly better position than an appellate court to assess the credibility of the jurors during voir dire questioning. See Ford v. State, 628 So.2d 1068 (Ala.Crim.App.1993). For that reason, we give great deference to a trial judge's ruling on challenges for cause. Baker v. State, 906 So.2d 210 (Ala.Crim.App.2001).'
" Turner v. State, 924 So.2d 737, 754 (Ala.Crim.App.2002)."
Scott v. State, 163 So.3d 389, 413 (Ala.Crim.App.2012).
The Alabama Supreme Court has stated that "[o]nly when a prospective juror's testimony indicates a bias or prejudice so fixed or deep-seated that that person cannot be impartial and objective must a challenge for cause be granted by the trial court." Ex parte Land, 678 So.2d 224, 240 (Ala.1996).
Furthermore,
" ' "[j]urors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the Court." Johnson v. State, 820 So.2d 842, 855 (Ala.Crim.App.2000).' Sharifi v. State, 993 So.2d 907, 926 (Ala.Crim.App.2008).
" 'It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination techniques that frequently are employed ... [during voir dire].... Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge may properly choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading.'
" Patton v. Yount, 467 U.S. 1025, 1039, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)."
Thompson v. State, 153 So.3d 84, 116 (Ala.Crim.App.2012).
A.
Johnson contends that the trial court erroneously refused to remove prospective jurors J.P., J.S., L.M., and W.W. for cause. According to Johnson, those prospective jurors indicated that they would automatically vote for the death penalty.
1.
Concerning prospective juror J.P., he initially told the trial court that he could follow the trial court's instructions and recommend a sentence of either life without parole or death depending on the particular circumstances of the case. (R. 160.) Upon questioning by Johnson's attorneys, prospective juror J.P. stated:
"[Defense counsel]: Would you vote for the death penalty in every case?
"Prospective juror [J.P.]: It would be depending upon the circumstances and how the Court directed us to view those circumstances.
"[Defense counsel]: In other words, you would follow the instructions of the Court?
"Prospective juror [J.P.]: Yes, sir.
"....
"[Defense co-counsel]: So, should I understand that you might be more inclined to impose the death penalty because this is a police officer?
"Prospective juror [J.P.]: Here again, it would depend on the circumstances.
*721 Since I don't know any of those circumstances, I can't tell you categorically yes or no.
"[Defense co-counsel]: And I'm trying to finish up as quickly as possible. When you say 'circumstances,' could you be a little more precise?
"Prospective juror [J.P.]: If a police officer were killed during a felony stop, which I have been involved in, I think that would warrant the death sentence.
"[Defense co-counsel]: It would have to be a felony?
"Prospective juror [J.P.]: I mean, if I'm doing a traffic stop and I walk up to a car to talk to the driver and ask for their license and I got shot and killed, that would warrant the death penalty as well.
"[Defense co-counsel]: Automatically?
"Prospective juror [J.P.]: Yeah. I mean, just different circumstances would warrant that.
"[Defense co-counsel]: So, in that last scenario, you would not be able to set aside anything the Court instructs you, but you would automatically vote for death in that circumstance?
"Prospective juror [J.P.]: Well, in the scenario I laid out, it is pretty cut and dry in my mind.
"[Defense co-counsel]: So, the answer is yes?
"Prospective juror [J.P.]: Yes, sir.
"[Defense co-counsel]: It would be automatic.
"Prospective juror [J.P.]: Yes, sir."
(R. 161, 163-64.)
Then, the following exchange occurred:
"The Court: Let me just ask you this, [J.P.]. We want to make sure that both the state and the defendant are on a level playing field and that you will be fair and impartial to both sides. I know you have views about the death penalty.
"You mentioned a while ago whenever the scenario was laid out by the defendant, you haven't heard the evidence in this case at this point in time. You said it is cut and dry in a particular set of circumstances.
"I'm going to, whenever I instruct you on the law in this case, if we get to that phase I would expect that any juror who served in this case could follow the instructions of the law, listen to the evidence presented in the courtroom and be able to recommend life without parole or the death sentence depending on those unique and individual circumstances involved in the case.
"I need to have the assurance of the jury that they would able to do that and disregard any preconceived notions that they have coming in here in the courtroom. Do you understand that?
"Prospective juror [J.P.]: Yes, sir.
"The Court: Are you going to be able to do that?
"Prospective juror [J.P.]: Yes, sir.
"The Court: So, whenever you said 'cut and dry' earlier, I need to kind of see where you are coming from on that.
"Prospective juror [J.P.]: Based on the limited facts of the scenario given, you know, it appeared to be premeditated. You know, you get stopped by a police officer, he walks up to ask you for your license and you shoot him and kill him. I mean, that was the scenario.
"The Court: You understand there are two phases involved in this case?
"Prospective juror [J.P.]: Yes.
"The Court: The first phase would be guilt or not of the crime.
"Prospective juror [J.P.]: Yes, sir.
"The Court: The second phase, if we got to that if you found the defendant *722 guilty of capital murder, would be a recommendation phase to the Court which the Court would seriously consider or give great weight to. In that phase you would hear certain things possibly from both sides. You understand that, don't you?
"Prospective juror [J.P.]: Yes, sir.
"The Court: And what I'm asking, is that going to be cut and dry to you after you hear the first phase?
"Prospective juror [J.P.]: No, sir. I would be able to follow the directions of the Court in the consideration of the penalty phase.
"The Court: So, what [defense counsel] mentioned to you, is that any different from what you told him?
"Prospective juror [J.P.]: Well-
"The Court: I'm kind of confused on it.
"Prospective juror [J.P.]: I'm getting a little confused myself.
"The Court: Do you understand what I'm saying? I want to make sure that you listen to both sides and you can consider life without parole or the death penalty and you base that strictly on the law that I give you and the evidence that comes out here in the courtroom.
"Prospective juror [J.P.]: Yes, sir.
"The Court: That you don't have your mind made up coming in here in the courtroom.
"Prospective juror [J.P.]: That would be correct, sir. I would try to come here as a sponge with no preconceived notions."
(R. 166-69.)
After being told that this case involved a traffic stop, prospective juror J.P. clarified: "Your Honor, if I may state for the record, I did not know this was during a traffic stop. That's how little I know about the case." (R. 169-70.) Prospective juror J.P. then gave his assurance to the trial court that he could be fair and impartial to both sides. (R. 170.) Finally, in response to questioning from Johnson's counsel, prospective juror J.P. stated:
"[Defense co-counsel]: When you hear evidence as presented that you are going hear and see-of course there is going to be the state's evidence. Will you equally give weight and be fair to any and all of the defense's evidence that's presented to you?
"Prospective juror [J.P.]: Yes, sir.
"[Defense co-counsel]: There's no question about that?
"Prospective juror [J.P.]: No, sir."
(R. 171.)
We hold that prospective juror J.P. was sufficiently rehabilitated to withstand a challenge for cause. Prospective juror J.P. stated multiple times that he would be fair and impartial to both sides concerning his sentencing recommendation. After questioning by the trial court, prospective juror J.P. stated that his sentencing recommendation would not be "cut and dry" after the guilt phase and that he would follow the trial court's instructions during the penalty phase. Prospective juror J.P. also stated that he would disregard any preconceived notions that he had. See Ex parte Land, 678 So.2d at 240 (stating that, "[e]ven though a prospective juror may initially admit to a potential for bias, the trial court's denial of a motion to strike that person for cause will not be considered error by an appellate court if, upon further questioning, it is ultimately determined that the person can set aside his or her opinions and try the case fairly and impartially, based on the evidence and the law"). Thus, considering the great deference given to the trial court's ruling on a challenge for cause, we conclude that no error occurred when the trial court refused *723 to strike prospective juror J.P. for cause.
2.
Concerning prospective juror J.S., the trial court did not grant Johnson's initial challenge for cause during individual voir dire. However, later, during group voir dire, prospective juror J.S. was removed for cause by a joint motion because he informed the trial court that, after further consideration, he decided that he could not consider life imprisonment without the possibility of parole as a penalty option. (R. 1135-37.) Therefore, because J.S. did not serve on the jury and Johnson was not forced to use one of his peremptory challenges to remove J.S., any error in denying the initial challenge for cause was harmless.
3.
Concerning prospective juror L.M., during individual voir dire, she told the trial court that she would base her sentencing recommendation strictly on the law and the evidence and that she would consider both life imprisonment without parole and the death penalty. The prosecutor noted that L.M. had stated in her juror questionnaire that she believed in the principle of an eye for an eye. The prosecutor asked L.M. whether she could "just base [her] verdict on the evidence that is presented both for the state and for the defendant in this case and then the law as the judge will instruct you." (R. 118.) L.M. responded that she could. Defense counsel asked L.M. to expound on what she meant by an eye for an eye. L.M. responded:
"I think that if someone did take someone's life and they were convicted of the crime and they were considered guilty, then I would vote for the death penalty if a murder case was involved. But I would still try to listen to the evidence, but I could still vote for it."
(R. 119-20.) Defense counsel then asked L.M. whether she would automatically vote for the death penalty. L.M. responded: "I wouldn't say automatically, but I would consider that that would be an appropriate punishment." (R. 120.) Defense co-counsel then asked: "So, based on those moral opinions, you could not put aside, could you, it would be death?" (R. 122-23.) L.M. responded that she "would listen to the evidence." (R. 123.) Finally, L.M. confirmed that she would base her decision on the law and the evidence and that she would be fair and impartial to both sides.
Prospective juror L.M. stated that she would base her sentencing recommendation on the evidence and the law, regardless of her beliefs concerning the principle of an eye for an eye. See Martin v. State, 548 So.2d 488, 490-91 (Ala.Crim.App.1988) (stating that "[t]he crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment," and that "[p]ersons who favor the death penalty should not be excused for cause where they indicate they will follow the court's instructions"). Therefore, considering L.M.'s answers and the fact that the trial court was in a decidedly better position than this Court to assess L.M.'s credibility, we find that the trial court did not err in refusing to strike L.M. for cause.
4.
Concerning prospective juror W.W., during individual voir dire, the trial court asked him whether he would automatically vote for the death penalty if the case reached the penalty phase. W.W. responded: "I think so. It might be tempered by what you say to me, your instruction." (R. 636-37.) The trial court then stated that it would give the jurors the law regarding the appropriate circumstances in which one could consider the death penalty, *724 and the trial court asked W.W. whether he could "consider life without parole if it was appropriate under the circumstances." (R. 637.) W.W. responded: "Yes." Id. W.W. stated that he could treat both sides fairly and impartially. The prosecutor then asked W.W. whether "he could treat both sides equally" and "come in here and approach it on a level playing field." (R. 638.) W.W. responded: "Yes." Id.
After an equivocal statement concerning whether he would automatically vote for the death penalty, prospective juror W.W. stated that he would consider a sentence of life imprisonment without parole and that he would treat both sides fairly and impartially. Based on those statements, we conclude that the trial court did not exceed its discretion in finding that W.W. could make his sentencing recommendation according to the evidence and the law.
B.
Next, Johnson contends that the trial court erroneously struck prospective jurors M.P. and W.Wi. for cause. According to Johnson, those prospective jurors disfavored the death penalty but would not automatically vote against it.
1.
During individual voir dire, prospective juror M.P. initially indicated to the trial court that she could consider either life imprisonment without parole or the death penalty depending on the circumstances of the case. Shortly thereafter, in explaining why she did not answer one of the questions on her juror questionnaire, M.P. stated:
"The reason was if I had the choice of my choice, I would not vote anybody to death. I wouldn't want that on my conscience. But if I was instructed one way or the other, then I would say I don't have a choice."
(R. 140.) M.P. further explained: "If the judge said to me under oath or rules that I have to pick or say that is what the death penalty was, obviously then I have to go with that." (R. 141-42.) The prosecutor then explained to M.P. that the trial court would not tell the jury which sentencing recommendation to choose. Instead, he explained, the choice would belong to the jury. M.P. responded: "Then I would go with life without parole." (R. 142.) The prosecutor asked M.P. whether she "would automatically go with life without parole." Id. M.P. responded: "Yes." Id.
In response to questioning from defense counsel, M.P. stated that she would consider the death penalty "if [she] had to consider it" and that she could vote for the death penalty "if [she] had to vote for it." (R. 143.) The trial court then asked M.P. whether she was a person who could follow the court's instructions and, depending on the circumstances, recommend either the death penalty or life imprisonment without parole. M.P. answered: "No." (R. 146.) M.P. explained: "Like I said, I don't think I can put anybody to death. If it was life without parole, I could do that, but not put them to death." Id. M.P. further explained: "I think just sitting here has made me realize I can't." Id. Defense counsel then asked M.P.: "You would follow the instruction of the law and if you had to do it you would consider death?" (R. 147.) M.P. responded that she would. Finally, the trial court asked M.P. whether she would have a problem recommending either the death penalty or life imprisonment without parole. M.P. responded: "I will have a problem." (R. 147-48.) M.P. then stated that she would not be able to consider both the death penalty and life imprisonment without parole and that she "wouldn't be able to follow the law all the way then." (R. 148.)
*725 M.P.'s answers indicated that she was biased against the death penalty and that she could not set aside that bias and consider both the death penalty and life imprisonment without parole. In fact, M.P. ended her individual voir dire by stating that she would not be able to follow the law. Therefore, the trial court did not err in striking M.P. for cause.
2.
When asked about the death penalty during individual voir dire, prospective juror W.Wi. stated: "I think I could live with life without parole, but I don't know that I could go along with the death penalty." (R. 646.) When asked again whether he could consider either life imprisonment without parole or the death penalty, W.Wi. stated: "Like I said, I think I could render life, but I don't think I could render death." (R. 647.) W.Wi. further stated: "If guilty and we have a choice of, then I'm going to make the choice of life without parole as opposed to the death penalty if I have that choice. If I don't have that choice, I don't feel comfortable." (R. 648.) The trial court then asked W.Wi.: "That's a fixed view that you have and it can't be changed?" (R. 648.) W.Wi. responded: "That's just the way I feel." Id.
Contrary to Johnson's allegation, there is nothing in W.Wi.'s individual voir dire that would indicate that he would not automatically vote against the death penalty. Johnson states in his brief that W.Wi. merely "expressed hesitancy about imposing death." Johnson's brief, at 56. In reality, W.Wi. indicated a strong bias against the death penalty, and, after significant questioning, he never denied that bias. Therefore, the trial court did not err in striking W.Wi. for cause due to his inability to consider the death penalty.
C.
Next, Johnson contends that the trial court erroneously refused to remove prospective jurors W.P., M.H., B.A., C.S., E.C., M.G., J.S., J.C., M.I., C.B., C.H., D.R., P.H., and M.C. for cause. According to Johnson, those prospective jurors indicated that they had a fixed opinion that Johnson was guilty. See § 12-16-150(7), Ala.Code 1975 (providing that "[i]t is good ground for challenge of a juror by either party ... [t]hat he has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict").
1.
Concerning prospective jurors W.P. and M.H., the trial court did not grant Johnson's initial challenges for cause during individual voir dire. However, later, during group voir dire, prospective jurors W.P. and M.H. were removed for cause because they stated that they could not entertain a mental-illness defense. (R. 1220, 1241-44.) Therefore, because W.P. and M.H. did not serve on the jury and because Johnson was not forced to use any of his peremptory challenges to remove them, any error in denying the initial challenges for cause was harmless.
2.
Prospective juror B.A. stated that she remembered seeing something about the incident on the news around the time the shooting occurred, but she did not remember any specific details of the incident. B.A. explicitly stated that she did not have an opinion concerning who was responsible for Officer Davis's death and that she did not remember whether she had any opinion about the incident when she saw something about it on the news. (R. 330-31.) Therefore, the trial court acted within its discretion when it refused to strike B.A. for cause.
3.
Prospective juror C.S. stated that, based on media accounts, she believed that *726 Johnson shot Officer Davis. C.S. stated that she could set aside anything she had heard about the case and rely solely on the evidence presented in court and that she could follow the trial court's instructions concerning the law. (R. 451, 456.) C.S. also stated that she would be "objective." (R. 451.) Thus, the trial court did not err in finding that C.S. could be a fair and impartial juror and in denying Johnson's challenge for cause.
4.
Prospective juror E.C. stated that she had "some media knowledge of the events," but she did not remember many details of the incident. (R. 471.) E.C. stated that she could set aside anything she had heard about this case and any impressions or opinions that she might have gathered from what she heard and that she could render a verdict solely on the evidence presented in the courtroom and the trial court's instructions concerning the law. E.C. also stated that, around the time the incident occurred, she discussed the incident with people at work. E.C. could not remember the opinions of any of her coworkers. E.C. had mentioned to her coworkers that possibly drug use was a cause of the incident because Johnson was a pharmacist. E.C. then stated:
"I would believe that [Johnson] is responsible. But as the judge stated yesterday, there are reasons why he has pled not guilty. I don't know what those are.
"So, from the previous knowledge that I have, I would say yes that I have an opinion. But with knowledge that I would learn as a juror, I don't know that I would keep that opinion."
(R. 476.)
Based on E.C.'s statements, we conclude that the trial court acted within its discretion in finding that any opinion E.C. had formed was not fixed and that she could set aside that opinion and be an impartial juror. Thus, the trial court did not err in denying Johnson's for-cause challenge to E.C.
5.
Prospective juror M.G. told the trial court that she could set aside anything she had heard about the case and any opinions she had formed and that she would consider only the evidence presented in court and the law as instructed by the trial court. The prosecutor asked M.G. whether she could set aside any prior opinions that she had formed or heard concerning the present case. M.G. responded:
"Yes, sir, because I have to consider that what I read and heard-I'm actually a little embarrassed that I don't remember details. But I have to realize that is what was reported. What will come out I would have to assume is more than that. That's what I would be basing it on."
(R. 600-01.)
In response to questions from Johnson's attorney, M.G. indicated that, based on what she had read in the paper at the time of the incident, she believed that Johnson was responsible for Officer Davis's death. M.G. also stated: "In spite of the fact that I do have an opinion, I am also able to listen to any evidence and make a decision based on that." (R. 603.)
M.G. ended her individual voir dire with the following exchange:
"The Court: You understand we are looking for jurors, as in any case, civil, criminal or whatever, that they give both parties a level playing field whenever they first come in here. That would be applicable for the state and the defendant that they start off on a level *727 playing field. Any verdict that's rendered is based solely, and I mean solely, on the evidence in the courtroom and not anything else. Do you understand that?
"Prospective juror [M.G.]: Yes.
"The Court: Can you assure the Court that you can do that?
"Prospective juror [M.G.]: Yes, sir."
(R. 606-07.)
M.G. stated that she had formed an opinion based on media accounts. However, she repeatedly stated that she could set aside that opinion and that she would base her verdict solely on the evidence that was presented at trial. Therefore, M.G. indicated that her opinion was not fixed. Accordingly, the trial court did not err in refusing to strike M.G. for cause.
6.
Prospective juror J.S. stated that he had read about the incident and had discussed it with his friends. In response to questions from the State, J.S. stated that he could set aside any opinions that he had and that he could render a verdict based solely on what he saw and heard in the courtroom. In response to questions from defense counsel, J.S. stated that he was shocked by the shooting and that, based on what he had read in the newspaper, he thought "it seemed a little excessive for the situation." (R. 624.) J.S. also indicated that, based on the reports he heard, he believed that Johnson shot Officer Davis. J.S. ended his individual voir dire with the following exchange:
"The Court: Let me ask you this, [J.S.]. Will you require the state to prove their case beyond a reasonable doubt?
"Prospective juror [J.S.]: Yes.
"The Court: And at the same time set aside anything that-any opinions you might have gathered before you came in here to court and only use the evidence that's presented in court?
"Prospective juror [J.S.]: Yes.
"The Court: And you can listen to both sides and be fair and impartial whenever you first go into this case; to both sides, the state and the defendant?
"Prospective juror [J.S.]: Yes, I can."
(R. 626-27.)
J.S. indicated that his opinion was not fixed and that his verdict would be based solely on the evidence presented at trial. The trial court was in a much better position than this Court to assess J.S.'s credibility. Accordingly, we do not find any error in the trial court's refusal to remove J.S. for cause.
7.
Prospective juror J.C. informed the trial court that he could set aside anything he had heard about the case and any opinions he had formed and that he would base his verdict solely on the evidence presented in court and the law as instructed by the trial court. (R. 725-26.) J.C. indicated that, based on media accounts of the incident, he had formed the opinion that Johnson shot Officer Davis. However, J.C. repeatedly stated that he could set aside that opinion and base his verdict solely on the evidence presented at trial. (R. 728-29, 734.) At the end of J.C.'s individual voir dire, the trial court specifically asked J.C.: "But from what I gather it's not a fixed opinion?" (R. 734.) J.C. responded: "That's correct. It's not based on fact, just based on reports on television and media." Id.
J.C. indicated that his verdict would be based solely on the evidence presented at trial, and he specifically stated that his opinion was not fixed. Therefore, we hold that the trial court did not err in refusing to strike J.C. for cause.
*728 8.
Prospective juror M.I. stated that she had "heard a little bit" about the case prior to coming to court and that she had formed the opinion that Johnson was responsible for Officer Davis's death. (R. 741, 748.) M.I. informed the trial court that she could set aside anything she had heard about the case and any opinions she had formed and that she would base her verdict solely on the evidence presented in court and the law as instructed by the trial court. M.I. stated that murder "is such a horrendous crime that, you know, it definitely is hard to set aside." (R. 745.) The prosecutor asked M.I. whether there was "any circumstance where you could imagine they would present a defense where you would feel like, you know, that is compelling and I'm going to vote in their favor, or are you automatically going to be swayed toward the state's evidence?" (R. 746.) M.I. responded: "That is hard to answer. I can't imagine a defense that would compel me to be swayed in their favor, but I can't say without really hearing it." (R. 746.) Then, M.I. was asked whether she would consider the defense of not guilty be reason of mental disease or defect, and she responded that she would consider that defense. (R. 747.) M.I. then stated that she would make her decision based solely on the evidence presented at trial and that she did not have a fixed opinion. (R. 748.) M.I. concluded her individual voir dire by again assuring the trial court that she could set aside any opinions she had regarding this case and that she could render a verdict based solely on the evidence presented at trial and the law given by the trial court. (R. 750.)
M.I. stated that she did not have a fixed opinion and that her verdict would be based solely on the evidence presented at trial. Considering the great deference given to the trial court's assessment of a prospective juror's credibility, we hold that the trial court did not err in refusing to remove M.I. for cause.
9.
Prospective juror C.B. informed the trial court that he worked for the City of Pelham in the tennis facility and that he had heard media accounts and "hearsay" from coworkers concerning the case. (R. 849-50.) C.B. stated that he had not discussed the case with any police officers. C.B. informed the trial court that he could set aside anything he had heard about the case and any opinions he had formed and that he would be a fair and impartial juror. C.B. also confirmed that he would base his decision solely on the evidence presented at trial and the law as instructed by the trial court. C.B. stated that he believed that Johnson was responsible for Officer Davis's death, but C.B. further stated that his opinion was not fixed. C.B. indicated that he did not wish to serve on the jury because of his affiliation with the City of Pelham; however, he stated that he would be fair and impartial and that he did not fear any retaliation if he was chosen to serve as a juror.
C.B. stated that he did not have a fixed opinion concerning this case, that he would base his decision solely on the evidence presented at trial, and that he would be fair and impartial if chosen to serve as a juror. Based on those statements, the trial court did not err in refusing to strike C.B. for cause.
10.
Prospective juror C.H. informed the trial court that he could set aside anything he had heard about the case and any opinions he had formed and that he would base his verdict solely on the evidence presented in court and the law as instructed by the trial court. Prospective juror C.H. indicated that, based on media accounts from around the time of the incident, *729 he had formed the opinion that Johnson was guilty "at that time." (R. 869-70.) However, when C.H. was asked whether he was "coming in this trial with that opinion," C.H. stated: "Not that he is guilty now, no. I'm waiting on the evidence as presented in this case before I do a final verdict to see." (R. 869-70.) Also, when C.H. was asked whether he would "find anybody not guilty by mental disease or defect," C.H. responded: "Like I said, I will listen to the evidence as presented in this court. If that evidence leads me to believe it is a mental defect, then I will vote that way." (R. 872.) C.H. concluded his individual voir dire by confirming to the trial court that he would be a fair and impartial juror and that he would base his decision on the trial court's instructions on the law and the evidence presented at trial.
There is no indication that C.H. had a fixed opinion concerning Johnson's guilt. Therefore, we hold that the trial court did not err in refusing to remove C.H. for cause.
11.
Prospective juror D.R. indicated that she had seen media accounts of the incident. After the trial court explained to D.R. that the verdict had to be based solely on the evidence presented at trial, she stated that she could base her verdict solely on the evidence presented at trial. D.R. stated that, based solely on media accounts from around the time of the incident, she had formed an opinion concerning who was responsible for Officer Davis's death. However, D.R. stated that she could set aside that opinion. In response to questioning from Johnson's attorney, the following exchange occurred:
"[Defense counsel]: Do you have an opinion right now?
"Prospective juror [D.R.]: Well, if you go by what the newspaper and the articles say, it would be logical that one would form an opinion.
"[Defense counsel]: What is that opinion?
"Prospective juror [D.R.]: The opinion would be that the person who was secured would have-in this case would stand a possibility of being the responsible party.
"[Defense counsel]: This man, the defendant?
"Prospective juror [D.R.]: That is a possibility, yes.
"[Defense counsel]: That's your opinion?
"Prospective juror [D.R.]: Yes, sir, that would be a possibility.
"[Defense counsel]: Do you consider yourself an open-minded juror with that opinion?
"Prospective juror [D.R.]: Yes. Yes, I do.
"[Defense counsel]: Because you've told us twice that everybody deserves a fair trial.
"Prospective juror [D.R.]: Yes, sir, they do.
"[Defense counsel]: Even though you have that opinion, you think that is an open-minded juror?
"Prospective juror [D.R.]: Yes, sir, I do. Because the judge here said can you set aside any preconceived ideas. I've lived long enough to know that even if one has preconceived ideas, when all of the facts come in that preconceived ideas can change. I've witnessed that. I've lived that."
(R. 897-98.)
D.R. stated that she could base her verdict solely on the evidence presented at trial and that she could set aside her previously formed opinion. D.R.'s statement that the defendant is possibly responsible *730 for the victim's death did not indicate "a bias or prejudice so fixed or deep-seated that [she] cannot be impartial and objective." Ex parte Land, 678 So.2d at 240. Therefore, the trial court did not err when it refused to strike D.R. for cause.
12.
Prospective juror P.H. indicated that she had heard media reports about the incident around the time it occurred. P.H. stated that, based on those reports, she had formed the opinion that Johnson was responsible for Officer Davis's death. However, P.H. stated that, instead of relying on what she had previously heard, she "would rely on what came from the witness stand" in reaching her verdict. (R. 936.) She also confirmed that she would follow the law given by the trial court and that she understood that the State had the burden of proving that Johnson was guilty. P.H. assured the trial court that she could reach a verdict based solely on the evidence presented at trial. (R. 942-43.)
P.H.'s answers did not indicate "a bias or prejudice so fixed or deep-seated that [she] cannot be impartial and objective." Ex parte Land, 678 So.2d at 240. Therefore, the trial court did not err when it refused to strike P.H. for cause.
13.
Prospective juror M.C. indicated that she had seen media accounts of the incident and that, based on those accounts, she had formed the opinion that Johnson was responsible for Officer Davis's death. However, M.C. repeatedly stated that she could set aside any opinions she had formed and that she would render a verdict based solely on the evidence presented at trial. (R. 971, 976, 981-82.)
M.C.'s answers did not indicate that she had a fixed opinion concerning Johnson's guilt. Therefore, the trial court did not err in refusing to strike M.C. for cause.
D.
Next, Johnson contends that the trial court erroneously refused to remove prospective jurors W.P., M.H., C.Hu., A.C., K.T., C.S., W.W., and C.H. for cause. According to Johnson, those prospective jurors indicated that they would not consider an insanity defense.
1.
Prospective jurors W.P., M.H., C.Hu., A.C., and K.T. were struck for cause by joint agreement during group voir dire because they stated that they could not consider an insanity defense. (R. 1220, 1241-44.) Therefore, because W.P., M.H., C.Hu., A.C., and K.T. did not serve on the jury and because Johnson was not forced to use any of his peremptory challenges to remove them, any error in otherwise not striking those prospective jurors for cause was harmless.
2.
Concerning Johnson's defense of not guilty by reason of mental disease or defect, prospective juror C.S. stated:
"Prospective juror [C.S.]: In this case because that second part that the judge explained about that he was asking for a plea of innocence based on mental illness and I wouldn't believe that. Because I'm a physician, I would have to have a really strong understanding as to what the basis for that opinion was. Because of that and my experience with working with psychiatry, I would have to be convinced of that diagnosis.
"[Prosecutor]: Okay. Having been a graduate of medical school, psychiatry was a part of your training and studies, correct?
"Prospective juror [C.S.]: Yes.
"[Prosecutor]: But you could set aside what you heard about this case and listen to the evidence as presented in court *731 during the trial and follow the judge's instructions to you regarding that evidence as to what the law is and how you are to apply that?
"Prospective juror [C.S.]: Yes, sir.
"[Prosecutor]: You would be a fair and impartial juror regarding that evidence and the law as he tells you?
"Prospective juror [C.S.]: I would be objective."
(R. 450-51.)
Shortly thereafter, C.S. confirmed that she would be able to consider psychiatric testimony from both the State and the defense and "determine which one should and which one should not apply." (R. 452.) C.S. further stated that she would be fair to both sides. (R. 452-53.) C.S. clarified that her familiarity with good and bad psychiatrists would factor into her evaluation of the witnesses who testify. C.S. stated:
"Prospective juror [C.S.]: Again, I believe it is because I've had a lot of experience with psychiatric care within this town, that I know many of the psychiatrists based on the care that they render, because of what I do.
"[Defense counsel]: But you don't really believe in a psychiatric defense, do you?
"Prospective juror [C.S.]: Let me put it this way. I know there are very excellent psychiatrists in town and I know, just like in any other profession, there are some that are not as good."
(R. 453-54.)
C.S. stated that she could consider psychiatric testimony from both the State and the defense, that she would follow the trial court's instructions, and that she would be fair to both sides. Those statements do not indicate that C.S. would not consider an insanity defense, nor do they indicate that C.S. has "a bias or prejudice so fixed or deep-seated that [she] cannot be impartial and objective." Ex parte Land, 678 So.2d at 240. Therefore, the trial court did not err by refusing to remove C.S. for cause.
3.
Prospective juror W.W. wrote on his juror questionnaire that he did not believe in insanity or temporary impairment. During individual voir dire, W.W. explained: "I personally don't believe that is an excuse. You still murdered someone." (R. 638.) However, in response to questions from the prosecutor, W.W. confirmed that he could set aside his personal feelings, listen to all the evidence, and follow the trial court's instructions concerning the defense of not guilty by reason of mental disease or defect. (R. 638-39.) Furthermore, at the conclusion of W.W.'s individual voir dire, in response to questions from the trial court, W.W. assured the court that he could disregard his personal feelings, that he could listen to all the evidence, and that he could follow the court's instructions. (R. 641.)
The trial court was in a much better position than this Court to assess W.W.'s credibility. W.W. stated multiple times that he could set aside his personal feelings, listen to all the evidence, and follow the trial court's instructions concerning an insanity defense. The trial court believed that testimony. There is no basis for us to hold that the trial court exceeded its discretion in refusing to remove W.W. for cause. Therefore, Johnson's claim is without merit.
4.
During individual voir dire, defense counsel asked prospective juror C.H.: "[W]hat do you think about a mental defect defense?" C.H. responded: "I don't think I'm qualified to say that, but I would think that there would be no mental *732 defect." (R. 871.) Then, the following exchange occurred:
"[Prosecutor]: Let me ask you this, if there are witnesses, expert witnesses that are testifying in this trial as to the mental issue both for the state and for the defendant, can you tell us that you will listen to what those experts say and weigh the evidence regarding the mental issues and not have a fixed opinion before you hear anything?
"Prospective juror [C.H.]: Right. Sure.
"[Prosecutor]: And then you'll have no problem listening to the judge as he tells you what the law is in that regard?
"Prospective juror [C.H.]: Absolutely.
"[Prosecutor]: Okay. Thank you. That's all.
"[Defense counsel]: The way I took that answer you gave me was that you're not going to find anybody not guilty by mental disease or defect.
"Prospective juror [C.H.]: Like I said, I will listen to the evidence as presented in this court. If that evidence leads me to believe it is a mental defect, then I will vote that way."
(R. 871-72.)
C.H. then assured the trial court that he would be a fair and impartial juror and that he would follow the trial court's instructions. (R. 872-73.)
Nothing in C.H.'s answers indicated that he would not consider an insanity defense if instructed to do so by the trial court. In fact, C.H. explicitly stated that if the evidence indicated that there was a mental defect, he would "vote that way." C.H. stated that he would follow the trial court's instructions, that he did not have a fixed opinion, and that he would be a fair and impartial juror. C.H. did not express "a bias or prejudice so fixed or deep-seated that [he] cannot be impartial and objective." Ex parte Land, 678 So.2d at 240. Therefore, the trial court did not err in refusing to remove C.H. for cause.
IV.
Next, Johnson contends that the trial court committed reversible error because, Johnson says, his counsel was not allowed to fully question prospective jurors during voir dire. Specifically, Johnson contends that his counsel was not allowed to fully question prospective jurors L.M. and C.S.
This Court has stated:
" ' "In selecting a jury for a particular case, 'the nature, variety, and extent of the questions that should be asked prospective jurors' must be left largely within the sound discretion of the trial court. Peoples v. State, 375 So.2d 561 (Ala.Crim.App.1979). In other words, the scope of the voir dire examination of the jury venire is within the broad discretion of the trial court. Bowens v. State, 54 Ala.App. 491, 309 So.2d 844 (1974), cert. denied, 293 Ala. 746, 309 So.2d 850 (1975) ; Witherspoon v. State, 356 So.2d 743 (Ala.Crim.App.1978) ; Ervin v. State, 399 So.2d 894 (Ala.Crim.App.), cert. denied, 399 So.2d 899 (Ala.1981)." '
" Hall v. State, 820 So.2d 113, 124 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001), quoting Bracewell v. State, 447 So.2d 815, 821 (Ala.Crim.App.1983), aff'd, 447 So.2d 827 (Ala.1984), cert. denied, 469 U.S. 980, 105 S.Ct. 382, 83 L.Ed.2d 318 (1984).
"There is no evidence that the trial court's disallowance of this specific question resulted in any prejudice to [the defendant]. The trial court did not abuse its discretion."
Stallworth v. State, 868 So.2d 1128, 1148 (Ala.Crim.App.2001).
*733 Furthermore, "[o]nce a juror makes an initial statement that is vague, ambiguous, equivocal, uncertain, or unclear or that shows confusion, it is the trial judge's function to question the juror further, in an effort to ascertain whether the juror can be impartial." Ingram v. State, 779 So.2d 1225, 1262 (Ala.Crim.App.1999).
A.
Prospective juror L.M. had indicated on her juror questionnaire that she believed in the Biblical principle of "an eye for an eye." L.M. told the trial court that she would consider both the death penalty and life imprisonment without parole. (R. 117-18.) In response to questioning from the prosecutor, L.M. confirmed that, regardless of the fact that she believed in the principle of an eye for an eye, she would consider all the evidence and follow the trial court's instructions. (R. 118.) Shortly thereafter, the following exchange occurred:
"[Defense counsel]: Yes, ma'am. In one of your answers-actually question seventy-eight-'Do you have any religious or moral feelings or philosophical principles that would affect your ability to vote for or against the death penalty in this case?' You said, 'Yes, Biblical principle, an eye for an eye.' Tell me what that means.
"Prospective juror [L.M.]: I think that if someone did take someone's life and they were convicted of the crime and they were considered guilty, then I would vote for the death penalty if a murder case was involved. But I would still try to listen to the evidence, but I could still vote for it.
"[Defense counsel]: What you are telling us if you got to the penalty phase of having to decide death or life without parole, it's an eye for an eye? It is Biblical with you; is that correct?
"Prospective juror [L.M.]: Yes.
"[Defense counsel]: You would automatically vote for the death penalty?
"Prospective juror [L.M.]: I wouldn't say automatically, but I would consider that that would be an appropriate punishment.
"[Defense counsel]: An eye for an eye?
"Prospective juror [L.M.]: Yes.
"....
"[Defense co-counsel]: You put in your sworn writing here with your Biblical principle that you would have a problem with moral, religious, philosophical, eye for an eye. That is from Leviticus, isn't it?
"Prospective juror [L.M.]: Yes.
"[Defense co-counsel]: That's who you are. So, based on those moral opinions, you could not put aside, could you, it would be death?
"Prospective juror [L.M.]: I would listen to the evidence.
"[Defense co-counsel]: You could listen, but based on what you swore, it's death, period, isn't it? That's who you are. You could not put it aside?
"[Prosecutor]: I object at this point. She has answered three times that she would not be automatic.
"The Court: Let me just ask you this-
"[Defense co-counsel]: I'm not asking her if it's automatic, I'm asking is this who she really is.
"The Court: Let me ask you this, [L.M.], to make sure. You understand if we ever got to that phase that I will give you the law that says under the circumstances you could consider the death penalty but only in those circumstances. Do you understand that?
"Prospective juror [L.M.]: I do.
*734 "The Court: Can you set aside what you mentioned in here, an eye for an eye, and base your decision in that phase on the law that I give you and, of course, the evidence that you hear in the courtroom?
"Prospective juror [L.M.]: I think I can.
"The Court: Anything else?
"[Defense co-counsel]: You are saying what you wrote down here, 'an eye for eye,' is not you, [L.M.], in certain circumstances; is that correct?
"[Prosecutor]: Object, again, Judge. The question has been asked and answered three times now.
"The Court: I think it has been. Any other questions?"
(R. 119-20, 122-24.)
We hold that the trial court did not exceed its discretion in not allowing Johnson's counsel to ask repetitive questions during L.M.'s individual voir dire. Before the trial court sustained the prosecutor's objection to defense counsel's question, L.M. stated that she would not automatically vote for the death penalty, and she repeatedly stated that she would consider all the evidence and follow the trial court's instructions. After the prosecutor's initial objection, in order to clear up any ambiguity, the trial court fulfilled its function by questioning L.M. further to ascertain whether she could be impartial. In response to the trial court's questioning, L.M. confirmed that she could set aside her belief in the principle of an eye for an eye and that she would base her sentencing recommendation on the law given by the trial court and on the evidence presented in the courtroom. There is no evidence indicating that the trial court's disallowance of defense counsel's question resulted in any prejudice to Johnson. Therefore, the trial court did not exceed its discretion, and we conclude that Johnson's claim is without merit.
B.
In prospective juror C.S.'s juror questionnaire, she answered "yes" to the following question: "In your opinion, whatever the reason may be, do you have such a strong opinion of murder in general that you feel it would be difficult for you to give a fair and impartial trial sitting as a juror to one charged with murder?" (R. 450.) During individual voir dire, the prosecutor asked C.S. to explain her answer to that question, and she complied with the prosecutor's request. (R. 450-51.) Johnson's counsel also asked C.S. to explain her answer to that question, and, again, she explained her answer. (R. 453-55.) When Johnson's counsel confronted C.S. with the question yet another time, the prosecutor objected on the ground that the question had already been asked and answered multiple times, and the trial court agreed with the prosecutor. (R. 455.) Finally, the trial court questioned C.S., as follows:
"The Court: Of course you told me a while ago that you could set aside anything that you've heard, seen or observed and rely solely on the evidence and the law I instruct you. Is that correct?
"Prospective juror [C.S.]: Yes, sir.
"The Court: You also could give both-consider both sides' position as far as life without parole or the death penalty and listen to my instructions on that as well?
"Prospective juror [C.S.]: Yes, sir.
"The Court: And you could follow those instructions and the evidence in the case?
"Prospective juror [C.S.]: Yes, sir."
(R. 456.)
As with prospective juror L.M., we find that the trial court did not exceed its discretion *735 in not allowing Johnson's counsel to ask repetitive questions to prospective juror C.S. Before the trial court sustained the prosecutor's objection to defense counsel's question, C.S. had already answered that specific question at least twice. Furthermore, after the prosecutor's objection, in order to clear up any ambiguity, the trial court fulfilled its function by questioning C.S. further to ascertain whether she could be impartial. In response to the trial court's questioning, C.S. confirmed that she could set aside anything she had previously observed, that she could rely solely on the evidence presented at trial and on the law given by the trial court, and that she could consider both life imprisonment without parole and the death penalty. There is no evidence indicating that the trial court's disallowance of defense counsel's question resulted in any prejudice to Johnson. Therefore, the trial court did not exceed its discretion, and we conclude that Johnson's claim is without merit.
V.
Next, Johnson argues that the trial court erred in denying his motion for a change of venue. Specifically, Johnson argues that the community was so saturated with pretrial publicity that no impartial jury could be selected and that the pretrial publicity created actual prejudice against him on the part of the jurors.
Before trial, Johnson filed a motion for a change of venue. (C. 399-404.) In that motion, Johnson stated that the death of Officer Davis had received widespread publicity in the local newspapers. Johnson also pointed out that the local newspapers had published several stories about the aftermath of Officer Davis's death. The motion also stated that "[s]imilar publicity was broadcast over the radio and television in Shelby County and the surrounding areas." (C. 401.) Although the motion made general allegations such as "[t]hese reports described the death, arrest and legal proceedings in sensationalized detail," the motion did not provide any specific details concerning the sensational nature of any specific media report. (C. 399-404.) After voir dire, the trial court heard oral argument concerning the motion. In that oral argument, defense counsel again argued that the death of Officer Davis and its aftermath had received widespread publicity. (R. 1102-23.) However, again, defense counsel did not provide any specific details concerning the sensational nature of any specific media report. Id. After hearing the oral argument, the trial court denied Johnson's motion for a change of venue. (R. 1123; C. 399.)
Under Rule 10.1(a), Ala. R.Crim. P., "[i]n any criminal case prosecuted by indictment or on appeal for trial de novo in which a jury is demanded, the defendant shall be entitled to a change of the place of trial to the nearest county free from prejudice if a fair and impartial trial and an unbiased verdict cannot be had for any reason." Under Rule 10.1(b), Ala. R.Crim. P., "[t]he burden is upon the defendant to show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried."
This Court has explained:
" 'In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated "actual prejudice" against him on the part of the jurors; 2) when there is "presumed prejudice" resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) ; Rideau [v.
*736 Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) ]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) ; Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985) ; Coleman v. Zant, 708 F.2d 541 (11th Cir.1983).
" 'The "actual prejudice" standard is defined as follows:
" ' "To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961) ]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and 'render [ed] a verdict based on the evidence presented in court.' Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756]."
" ' Coleman v. Zant, 708 F.2d at 544.
" '... [The defendant] relies on the "presumed prejudice" standard announced in Rideau, and applied by the United States Supreme Court in Estes and Sheppard. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: "Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held." 778 F.2d at 1490 (emphasis added). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
" 'In determining whether the "presumed prejudice" standard exists the trial court should look at "the totality of the surrounding facts." Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) ; Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) ; Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is "rarely" applicable, and is reserved for only "extreme situations." Coleman v. Kemp, 778 F.2d at 1537. "In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice." Coleman v. Kemp, 778 F.2d at 1490.'
" Hunt v. State, 642 So.2d 999, 1042-44 (Ala.Crim.App.1993).
" 'The burden of showing actual prejudice or community saturation with prejudicial publicity lies with the appellant. Sheppard v. Maxwell, 384 U.S. 333 (1966). In addition, the appropriate method to establish the existence of adverse publicity or actual prejudice is through voir dire examination of potential jurors. Anderson v. State, 362 So.2d 1296 (Ala.Cr.App.1978) ; Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865 (1985).'
" Hart v. State, 612 So.2d 520, 527 (Ala.Crim.App.1992).
" '[T]he determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling *737 against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial.'
" Nelson v. State, 440 So.2d 1130, 1132 (Ala.Crim.App.1983)."
Scott v. State, 163 So.3d 389, 411-12 (Ala.Crim.App.2012).
Furthermore, in Woodward v. State, 123 So.3d 989 (Ala.Crim.App.2011), this Court stated:
"Certainly the shooting of a Montgomery police officer during the course of a traffic stop and the arrest and upcoming trial of the accused shooter generated widespread media coverage. That fact, alone, however, could not support a finding of presumed prejudice. The media coverage, moreover, contained largely factual reports about the shooting and the events surrounding Officer Houts's death and about the investigation and prosecution. The reports were not inherently prejudicial, inflammatory, or sensational. Furthermore, the publicity surrounding the case diminished substantially in the nearly two years between the shooting and the time of trial. 'The passage of time tends to bring objectivity to a case in which there has been extensive pretrial publicity.' Ex parte Fowler, 574 So.2d 745, 748-49 (Ala.1990).
"The presumptive-prejudice standard recognized in Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), is to be applied only in extreme situations in which a defendant can show that he or she cannot receive a fair trial because the community was so saturated with prejudicial pretrial publicity. [The defendant] did not make a showing that his case is in that rare category. We hold that the trial court did not abuse its substantial discretion when it denied [the defendant's] motion for a change of venue."
123 So.3d at 1051.
In the present case, Johnson has failed to show that the trial court exceeded its discretion in denying his motion for a change of venue based on the totality of the surrounding facts. Johnson has not demonstrated either presumed prejudice or actual prejudice.
Concerning presumed prejudice, although Johnson has shown that there was widespread publicity concerning the death of Officer Davis and its aftermath, he has not set forth any evidence indicating that the media reports were anything other than largely factual accounts, nor has he set forth any evidence indicating that the media reports were inherently prejudicial, inflammatory, or sensational. The present case does not present an "extreme" situation in which the presumptive-prejudice standard would be applicable. Therefore, we hold that Johnson failed to carry his burden of showing presumed prejudice.
Concerning actual prejudice, Johnson has not pointed out any juror who had a preformed opinion that Johnson was guilty and who could not lay aside that preformed opinion and render a verdict based on the evidence presented at trial. In Johnson's brief, he cites prospective jurors W.P., M.H., B.A., C.S., E.C., M.G., J.S., J.C., M.I., C.B., C.H., D.R., P.H., and M.C. to support his contention. Johnson simply states that those prospective jurors "all said they already believed Mr. Johnson was guilty based on the pretrial publicity of the case." Johnson's brief, at 63. First, concerning those prospective jurors, only J.C. ultimately served on the jury and decided the case, and prospective jurors W.P. and M.H. were removed for cause. Furthermore, as we addressed in Part III.C., *738 supra, to the extent that any of the prospective jurors who were not removed for cause, including J.C., had a preformed opinion that Johnson was guilty, voir dire revealed that that opinion could be laid aside and that those prospective jurors could render a verdict based on the evidence presented at trial. Therefore, Johnson has failed to meet his burden of showing actual prejudice; thus, he has failed to establish any error concerning the trial court's denial of his motion for a change of venue.
VI.
Next, Johnson argues that the State failed to present sufficient evidence to support either of the two aggravating circumstances that were offered to allow the imposition of his death sentence.
Section 13A-5-45(f), Ala.Code 1975, provides: "Unless at least one aggravating circumstance as defined in Section 13A-5-49 exists, the sentence shall be life imprisonment without parole." In the present case, the State offered the following two aggravating circumstances to allow the imposition of the death penalty: (1) "[t]he capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody" and (2) "[t]he capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws." § 13A-5-49(5) and (7), Ala.Code 1975. The jury was instructed concerning both of those aggravating circumstances. (R. 2211-12.) The jury then returned a recommendation of death for each conviction. (R. 2250-51.) In sentencing Johnson to death for each conviction, the trial court found that both of those aggravating circumstances existed. (C. 438.)
Concerning whether the offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, we note that, under Alabama law, refusal to sign a written ticket is cause for an arrest. § 32-1-4, Ala.Code 1975. During the penalty phase, Peter Fulmer, a lieutenant with the Pelham Police Department, testified that, until a ticket is signed, the person who is receiving the ticket is "not free to leave." (R. 2062.) Lt. Fulmer explained: "By signing the ticket, they are not acknowledging their guilt, they are just promising to appear in court. They're basically making their bond on that charge." Id. Lt. Fulmer further testified that if a person refuses to sign the ticket, the officer issuing the ticket does not "have any choice but to take them-make a physical custodial arrest." (R. 2062-63.) At trial, the State presented evidence indicating that Officer Davis stopped Johnson for speeding, prepared a written speeding ticket, and intended to issue that ticket to Johnson. However, when Johnson was asked to sign the ticket, he shot Officer Davis and drove away. Specifically, the recording of the traffic stop revealed that, while Officer Davis held his ticket book in his hands, he leaned toward the driver's side window and told Johnson: "I need your signature at the bottom." Then, immediately, Johnson shot Officer Davis in the face and drove away. Therefore, the State presented evidence indicating that Johnson did not intend to sign the ticket, which would have led to his arrest if he had not shot Officer Davis. Thus, we hold that this evidence was sufficient to find that the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
Concerning whether the capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws, we point out that this Court has previously *739 held that that aggravating circumstance is proper when an on-duty police officer is murdered while conducting a traffic stop. See Woodward, 123 So.3d at 1058 (holding that the trial court committed no error in finding that the defendant committed the murder to disrupt or hinder the enforcement of laws when the evidence indicated that the defendant murdered an on-duty police officer while the officer was conducting a traffic stop); see also Cade v. State, 521 So.2d 80, 84 (Ala.Crim.App.1986) (holding that the evidence supported a finding that the capital offense was committed to disrupt or hinder the lawful exercise of a governmental function or the enforcement of laws when the evidence indicated that the murder occurred while a police officer was in process of arresting the defendant). In the present case, the State presented evidence indicating that Johnson murdered Officer Davis while he was on duty and while he was conducting a traffic stop. Therefore, we conclude that the evidence was sufficient to find that the capital offense was committed to disrupt or hinder the lawful exercise of a governmental function or the enforcement of laws.
VII.
Johnson further argues that the trial court erred in allowing him to withdraw his plea of not guilty and to plead only not guilty by reason of mental disease or defect without first ascertaining whether his decision was voluntary and whether he fully understood the consequences of his decision.
Before trial, the trial court told Johnson and his counsel that the court did not "want to get into confidential communications" and that the court understood their strategy to plead only not guilty by reason of mental disease or defect. (R. 1260.) The Court also noted that, even if Johnson withdrew his plea of not guilty, "the State still has to prove their case beyond a reasonable doubt." Id. Nevertheless, the trial court stated: "I just want to make sure that you have discussed it with your client and that he acknowledges that all strategies that y'all have mentioned to him have been discussed and he agrees with it." (R. 1261.) Both Johnson and his counsel responded: "Yes." Id. At trial, the trial court still required the State to prove Johnson's guilt of the capital offense beyond a reasonable doubt to the jury. When the State rested, the defense moved for a judgment of acquittal arguing that the State had failed to prove a prima facie case. (R. 1551.) The trial court denied that motion. Id.
On appeal, Johnson argues that his decision to withdraw his plea of not guilty and to plead only not guilty by reason of mental disease or defect was the functional equivalent of a guilty plea and that the trial court should have conducted the guilty-plea colloquy required by Rule 14.4(a), Ala. R.Crim. P., which would have required the trial court to ascertain whether Johnson's plea was voluntary and whether he understood the consequences of his plea. However, on its face, Rule 14.4(a) applies only when the trial court "accept[s] a plea of guilty," and there is no such rule of law requiring the trial court to conduct a colloquy when the defendant pleads only not guilty by reason of mental disease or defect. As this Court has stated:
" ' "A plea of guilty is more than a voluntary confession made in open court. It also serves as a stipulation that no proof by the prosecution need b [e] advanced.... It supplies both evidence and verdict, ending controversy." ' Boykin [v. Alabama ], 395 U.S. [238,] 243 n. 4, 89 S.Ct. 1709 [ (1969) ] (quoting Woodard v. State, 42 Ala.App. 552, 171 So.2d 462, 469 (1965) )."
*740 Clark v. State, 29 So.3d 252, 253 (Ala.Crim.App.2009).
In the present case, Johnson's plea did not serve as a stipulation that the State did not need to advance any proof, nor did it supply the evidence and the verdict needed to end the controversy. Thus, contrary to Johnson's contention, we hold that his decision to plead only not guilty by reason of mental disease or defect was not the functional equivalent of a guilty plea. Therefore, considering that there is no rule of law requiring the trial court to conduct a Rule 14.4(a) -type colloquy when the defendant pleads only not guilty by reason of mental disease or defect and that Johnson's plea was not the functional equivalent of a guilty plea, we hold that the trial court did not err in allowing Johnson to withdraw his plea of not guilty and to plead only not guilty by reason of mental disease or defect without first ascertaining whether his decision was voluntary and whether he fully understood the consequences of his decision.
VIII.
Next, Johnson argues that the trial court erroneously excluded as hearsay a written statement provided to the Alabama State Pharmacy Board by Wes Maddox, who was Johnson's work supervisor. Specifically, Johnson argues that the statement was not hearsay and that, if it was hearsay, it was admissible under Rule 803(6), Ala. R. Evid., which contains the business-records exception to the hearsay rule.
Maddox testified that an investigator for the Alabama State Board of Pharmacy asked him to write a statement concerning Johnson and that he complied with that request. Defense counsel attempted to introduce that written statement at trial. (R. 1557.) The prosecutor objected on the ground that the statement was hearsay. (R. 1557, 1568.) Defense counsel argued that the statement was not hearsay because, he said, the "proper predicate was laid when [Maddox] said 'I wrote the letter.' " (R. 1569.) The trial court responded: "I know, but any time a witness writes a letter to someone it doesn't make it an exception." Id. Then, the trial court sustained the objection. Id. Later, defense counsel asked the trial court to reconsider its ruling and argued that the statement was admissible under Rule 803(6), Ala. R. Evid. (R. 1571.) Specifically, defense counsel argued that the statement was admissible under the business-records exception to the hearsay rule because, he said, Maddox was a supervisor for Fred's Pharmacy and it was his regular duty to make reports to the Alabama State Board of Pharmacy. (R. 1572.) Again, the trial court ruled that the letter was inadmissible. (R. 1574.)
The written statement is part of the record on appeal. It is a one-page letter written by Maddox to the Alabama State Pharmacy Board on December 11, 2009. The letter states:
"As a follow up to our conversation today, I am providing you with a statement based on what we discussed. My name is Wes Maddox and I am the HealthCare Manager for Fred's Pharmacy in the state of Alabama. Bart Johnson has worked for me since May 2007. Below is a list of Fred's Pharmacy locations in which he has worked and the position he held at each:
"4/20/01-Store 1186-PH08 (student Part-time)/PH04 (Hourly Pharmacist)/PH03 (Salaried Pharmacist)
"1/21/05-Store 1371-PH02 (Pharmacy Manager)
"2/03/06-Store 2504-PH02 (Pharmacy Manager)
"3/28/08-Store 2036-PH02 (Pharmacy Manager)
*741 "Most recently Bart has been the PIC at store 2036 in Jasper, AL. Bart knows our pharmacy operating system very well and how Fred's operates. Due to this fact, Bart was a resource for other pharmacists learning our systems, as well as someone who would assist me in opening new stores. I have never had any issues with Bart, and I have never had to perform a coaching and counseling session (PIP-Performance Improvement Plan) with him. As we discussed, I am not aware of any anger issues or impairment problems. I do not recall any shortages in the time Bart has worked for me. Recently, I had asked Bart to help me with a new store opening in Bayou La Batre. He agreed to go work at the store November 19 and 20 for the Soft Grand Opening, as well as go back and train my new PIC November 30-December 3."
(C. 535.)
On appeal, Johnson alleges that the written statement was not hearsay, but he does not give any explanation as to why the statement was not hearsay. The only argument that Johnson made at trial was that the statement was not hearsay because "[Maddox] said 'I wrote the letter.' " Rule 801(c), Ala. R. Evid., provides that " '[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(a), Ala. R. Evid., provides that "[a] 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Clearly, the trial court was correct in ruling that an out-of-court statement is not removed from the hearsay rule simply because a witness testifies that he wrote the statement. Further, we recognize that Maddox's letter was an out-of-court written assertion, i.e., a statement, and Johnson has never contended that it was not offered to prove the truth of the matter asserted. Therefore, we hold that the letter was hearsay.
Furthermore, the letter was not admissible under the business-records exception to the hearsay rule. Rule 803(6), Ala. R. Evid., provides:
"A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."
In order for evidence to be admissible under this hearsay exception, the proponent must first lay the proper foundation as set forth in the rule. See Ex parte Frith, 526 So.2d 880, 882 (Ala.1987) (stating that, "[a]bsent a proper foundation and authentication, such a record is simply not reliable and is subject to the general hearsay rule of inadmissibility").
In the present case, Johnson argues that the letter was admissible under the business-records exception to the hearsay rule because, he says, Maddox was a supervisor for Fred's Pharmacy and it was his regular duty to make reports to the Alabama State *742 Board of Pharmacy. However, Maddox never testified that it was his regular duty to make reports to the Alabama State Board of Pharmacy. More specifically, he never testified that this particular letter was made in the regular course of his business as a supervisor for Fred's Pharmacy. Therefore, Johnson failed to lay the proper foundation for admission of the letter under the business-records exception to the hearsay rule. Thus, we hold that the trial court did not err in ruling that the letter was inadmissible hearsay.
Moreover, even if the letter was erroneously excluded, the error was harmless. " '[T]he exclusion of admissible evidence does not constitute reversible error where the evidence "would have been merely cumulative of other evidence of the same nature, which was admitted." ' " Brownfield v. State, 44 So.3d 1, 25 (Ala.Crim.App.2007) (quoting Houston v. State, 565 So.2d 277, 281 (Ala.Crim.App.1990) ). Maddox testified that he supervised the stores where Johnson worked, that he did not recall any drug shortages in the stores where Johnson worked, that he was not aware of any anger issues with Johnson, that Johnson was a good employee, and that he asked Johnson to help him open a new store in Bayou La Batre. (R. 1555-56.) Therefore, the information in the letter was cumulative of Maddox's testimony. Thus, if the exclusion of the letter was error at all, it was not reversible error.
IX.
Next, Johnson argues that the trial court erred in refusing to charge the jury on the lesser-included offense of manslaughter. Specifically, Johnson argues that he was entitled to a manslaughter charge because, he says, there was evidence indicating that he was intoxicated when he caused Officer Davis's death.
At trial, defense counsel requested a manslaughter charge, arguing that "there has been evidence presented that negated the intentional aspects of the murder and that, if intention is negated, then certainly you have to look at manslaughter at that point." (R. 1911.) Defense counsel did not mention intoxication. The State responded that "there is no evidence for recklessness of any kind, especially considering the fact that the defendant has withdrawn his plea of not guilty." (R. 1912.) The trial court denied defense counsel's request. Id.
Under § 13A-6-3(a)(1), Ala.Code 1975, a person commits the crime of manslaughter if "he recklessly causes the death of another person." Section 13A-2-2, Ala.Code 1975, provides, in relevant part: "A person who creates a risk but is unaware thereof solely by reason of voluntary intoxication, as defined in subdivision (e)(2) of Section 13A-3-2, acts recklessly with respect thereto."
In Pilley v. State, 930 So.2d 550 (Ala.Crim.App.2005), this Court stated:
" 'A charge on intoxication should be given if " 'there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt' " in the element of intent. Coon v. State, 494 So.2d 184, 187 (Ala.Cr.App.1986) (quoting Government of the Virgin Islands v. Carmona, 422 F.2d 95, 99 n. 6 (3d Cir.1970) ). See also People v. Perry, 61 N.Y.2d 849, 473 N.Y.S.2d 966, 966-67, 462 N.E.2d 143, 143-44 (App.1984) ("[a] charge on intoxication should be given if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis"). An accused is entitled to have the jury consider the issue of his intoxication where the evidence of intoxication is conflicting, *743 Owen v. State, 611 So.2d 1126, 1128 (Ala.Cr.App.1992) ; Crosslin v. State, 446 So.2d 675, 682 (Ala.Cr.App.1983), where the defendant denies the commission of the crime, Coon v. State, 494 So.2d at 187 ; see Moran v. State, 34 Ala.App. 238, 240, 39 So.2d 419, 421, cert. denied, 252 Ala. 60, 39 So.2d 421 (1949), and where the evidence of intoxication is offered by the State, see Owen v. State, 611 So.2d at 1127-28.'
" Fletcher v. State, 621 So.2d [1010,] 1019 [ (Ala.Crim.App.1993) ]. Additionally, ' "[w]hen the crime charged involves a specific intent, such as murder, and there is evidence of intoxication, the trial judge should instruct the jury on the lesser included offense of manslaughter." ' Harper v. State, 629 So.2d 67, 69 (Ala.Crim.App.1993), quoting Gray v. State, 482 So.2d 1318, 1319 (Ala.Crim.App.1985).
"What [the defendant] fails to comprehend, however, is what constitutes 'evidence of intoxication' necessary to entitle a defendant to such an instruction. The Alabama Legislature has defined 'intoxication' to include 'a disturbance of mental or physical capacities resulting from the introduction of any substance into the body.' § 13A-3-2(c)(1), Ala.Code 1975. Thus, evidence that the defendant ingested alcohol or drugs, standing alone, does not warrant a charge on intoxication. '[T]here must be evidence that the ingestion caused a disturbance of the person's mental or physical capacities and that that mental or physical disturbance existed at the time the offense was committed.' Lee v. State, 898 So.2d 790, 838 (Ala.Crim.App.2001) (opinion on return to remand), cert. denied, 898 So.2d 874 (Ala.), cert. denied, 543 U.S. 924, 125 S.Ct. 309, 160 L.Ed.2d 222 (2004). See also Maples v. State, 758 So.2d 1, 23 (Ala.Crim.App.), aff'd, 758 So.2d 81 (Ala.1999). Such a holding is consistent with this Court's opinion in Windsor v. State, 683 So.2d 1027, 1037 (Ala.Crim.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), in which we stated:
" 'In this case, however, there was no evidence that the appellant was intoxicated. Although there was evidence that the appellant had been drinking beer on the day of the robbery-murder, there was no evidence concerning the quantity of beer he consumed that day at the time of the murder. Evidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated. There was no "reasonable theory" to support an instruction on intoxication because there was no evidence of intoxication. There court did not err in not instructing the jury on intoxication and manslaughter where there was no evidence that the appellant was intoxicated at the time the robbery-murder occurred.'
"A defendant is entitled to a charge on a lesser-included offense only if there is any reasonable theory from the evidence to support the charge. Ex parte Smith, 756 So.2d 957, 963 (Ala.2000). '[I]nstructions on intoxication and manslaughter are not required when they would be inconsistent with the defense strategy.' Maples v. State, 758 So.2d at 23. Additionally, the court should charge on voluntary intoxication only when there is a sufficient evidentiary foundation in the record for a jury to entertain a reasonable doubt as to the element of intent. Ex parte McWhorter, 781 So.2d 330, 342 (Ala.2000)."
930 So.2d at 561-62.
In the present case, Johnson cites two pieces of evidence to support his contention. First, Johnson cites Dr. Golden's *744 testimony concerning the entire time that Johnson was in Bayou La Batre helping to open the new store. Dr. Golden testified that, during that time, "[Johnson] was drinking" and "taking medications for-his Imitrex for his headaches for migraines." (R. 1616.) Dr. Golden further testified that, when he interviewed Johnson, Johnson did not remember how much he drank or how many pills he consumed. Id. Although not cited by Johnson in his brief, Dr. Golden later testified that, when Johnson left work at around 8 or 9 p.m. on the night of the shooting, "he went to a McDonald's and bought a Coke and I guess a burger or something, and put rum in the Coke." (R. 1625-26.) However, Dr. Golden never testified that voluntary intoxication caused Johnson to act recklessly at the time of the offense. Instead, Dr. Golden testified that, due to a variety of factors, Johnson suffered an acute or brief psychotic episode that rendered him incapable of understanding the wrongfulness of his acts at the time of the offense. Second, Johnson cites Dr. King's testimony that, when he interviewed Johnson, Johnson stated that he "had a few drinks" when he was driving home on the night of the shooting. (R. 1869.) During the interview, Dr. King specifically asked Johnson whether he was intoxicated, and he did not respond. Id.
There was no evidence concerning whether Johnson's ingestion of "a few drinks" over the course of his drive from Bayou La Batre to Pelham-a distance of about 250 miles-caused a disturbance of his mental or physical capacities at the time the offense was committed. Mere " ' "[e]vidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated," ' " and "evidence that the defendant ingested alcohol or drugs, standing alone, does not warrant a charge on intoxication." Pilley, 930 So.2d at 562. Therefore, we hold that there was not sufficient evidence of intoxication for the jury to entertain a reasonable doubt as to the element of intent, and, thus, there was no reasonable theory from the evidence to support a manslaughter charge. Accordingly, we hold that the trial court did not err in refusing to charge the jury on the lesser-included offense of manslaughter.
X.
Next, Johnson argues that his death sentence was imposed in violation of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and, thus, is unconstitutional. In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the United States Supreme Court held that the Constitution requires that any fact that increases the penalty for a crime above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. In Ring, the Court extended its holding in Apprendi to death-penalty cases.
Specifically, Johnson argues that his death sentence violated Ring because the jury's guilt-phase verdict did not establish the existence of an aggravating circumstance, the jury did not return a unanimous sentencing recommendation, and the jury did not specify which aggravating circumstance or circumstances it found to exist. However, Johnson misconstrues what Ring requires.
The Alabama Supreme Court has explained:
"Ring and Apprendi do not require that the jury make every factual determination; instead, those cases require the jury to find beyond a reasonable doubt only those facts that result in 'an increase in a defendant's authorized punishment ...' or ' "expose[ ] [a defendant] to a greater punishment...." '
*745 Ring, 536 U.S. at 602, 604, 122 S.Ct. at 2439, 2440 (quoting Apprendi, 530 U.S. at 494, 120 S.Ct. 2348 ). Alabama law requires the existence of only one aggravating circumstance in order for a defendant to be sentenced to death. Ala.Code 1975, § 13A-5-45(f). The jury in this case found the existence of that one aggravating circumstance.... At that point, [the defendant] became 'exposed' to, or eligible for, the death penalty."
Ex parte Waldrop, 859 So.2d 1181, 1190 (Ala.2002).
Thus, to satisfy the requirements of Ring and Apprendi, it is not necessary that the guilt-phase verdict establish the existence of an aggravating circumstance, that the jury return a unanimous sentencing recommendation, or that the jury specify which aggravating circumstance or circumstances it found to exist. Instead, under Alabama's capital-sentencing scheme, Ring and Apprendi require only that the jury unanimously find beyond a reasonable doubt that at least one aggravating circumstance exists.
In the present case, the trial court instructed the jury on the two aggravating circumstances it could consider, and the court repeatedly instructed the jury that it could not even consider recommending the death penalty unless it first unanimously found beyond a reasonable doubt that at least one of those aggravating circumstances existed. (R. 2210-14, 2217, 2227-28, 2238-39, 2243.) "It is well settled that jurors are presumed to follow, not disregard, the trial court's instructions." Brooks v. State, 973 So.2d 380, 409 (Ala.Crim.App.2007). We find that, because the jury recommended by a vote of 10-2 that Johnson be sentenced to death, it is clear that the jury unanimously found the existence of at least one aggravating circumstance. See Pilley, 930 So.2d at 567-68 (finding that a jury vote of 10-2 recommending the death penalty demonstrated that the jury unanimously found the existence of a proffered aggravating circumstance because the trial court had specifically instructed the jury that it could not proceed to a vote on whether to impose the death penalty unless it had already unanimously agreed that an aggravating circumstance existed); see also Ex parte McNabb, 887 So.2d 998, 1004-06 (Ala.2004) (same). Therefore, the imposition of Johnson's death sentence did not violate Ring.
XI.
Next, Johnson makes a general allegation that the trial court erred in denying his motion for a judgment of acquittal because, he says, the State failed to present a prima facie case. Johnson moved for a judgment of acquittal at the conclusion of the State's case-in-chief, and he renewed that motion at the conclusion of the defense's evidence. (R. 1551, 1778.) On appeal, as he did in his motion for a judgment of acquittal, Johnson does not state with any degree of specificity how the State's evidence was insufficient or which element of the offense the State failed to establish.
This Court has stated:
"In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state's evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). The trial court's denial of a motion for a judgment of acquittal must be reviewed by determining whether *746 there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983) ; Thomas v. State. When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969) ; Willis v. State."
Breckenridge v. State, 628 So.2d 1012, 1018 (Ala.Crim.App.1993).
Furthermore,
" '[c]ircumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.' White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). 'Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.' Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala.1985)."
White v. State, 546 So.2d 1014, 1017 (Ala.Crim.App.1989).
" 'In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir.1974) ; United States v. McGlamory, 441 F.2d 130 (5th Cir.1971) ; Clark v. United States, 293 F.2d 445 (5th Cir.1961).' "
Bradford v. State, 948 So.2d 574, 578-79 (Ala.Crim.App.2006) (quoting Cumbo v. State, 368 So.2d 871, 874-75 (Ala.Crim.App.1978) ).
Johnson was convicted of two counts of murder made capital because the victim was a police officer who was on duty, see § 13A-5-40(a)(5), Ala.Code 1975, and because the murder was committed by or through the use of a deadly weapon fired within or from a vehicle, see § 13A-5-40(a)(18), Ala.Code 1975. Under § 13A-6-2(a)(1), Ala.Code 1975, a person commits the crime of murder if he or she, "with intent to cause the death of another person, ... causes the death of that person or of another person." This Court has stated:
"Whether a defendant intentionally caused the death of another person is a question of fact for the jury. Carr v. State, 551 So.2d 1169 (Ala.Crim.App.1989). Intent may be presumed from the use of a deadly weapon or from other circumstances. Barnes v. State, 571 So.2d 372 (Ala.Crim.App.1990). Intent is usually proven by circumstantial evidence. Smith v. State, 795 So.2d 788 (Ala.Crim.App.2000)."
Blount v. State, 876 So.2d 509, 512 (Ala.Crim.App.2003).
In the present case, the State presented evidence indicating the following. A digital recording showed that Officer Davis stopped Johnson's Acura sedan for *747 speeding and that, during that stop, the driver of the sedan shot Officer Davis in the face with a pistol. The recording also revealed that, before the shooting, the driver informed Officer Davis that his brother was a police officer. The police officers who initially responded to the scene of the shooting discovered Officer Davis's ticket book lying near his body, and the most recent ticket in the book contained information about Johnson. Shortly after the shooting, Johnson's Acura sedan was discovered in a neighborhood in north Birmingham, and a resident of that neighborhood observed someone in a gray Toyota Tundra truck pick up the driver of the Acura sedan. Shortly after that event, Johnson's brother, who was a police officer, stopped his gray Toyota Tundra truck on the side of the interstate near some police officers from the City of Hoover, and he and Johnson exited the truck. A .40 caliber pistol was recovered from the glove compartment of the Toyota Tundra truck. DNA analysis revealed that blood found on that pistol came from Officer Davis. DNA analysis further revealed that blood found on Johnson's Acura sedan and on his clothing came from Officer Davis. Also, a senior state medical examiner testified that Officer Davis "died from a gunshot wound to the face that injured his spinal column" and that the gunshot was fired within a few inches of Officer Davis's face.
We hold that this evidence was sufficient to support the jury's verdict. Based on this evidence, the jury by fair inference could have found beyond a reasonable doubt that Johnson murdered Officer Davis while he was on duty and that Johnson murdered Officer Davis by or through the use of a deadly weapon fired within or from a vehicle. Therefore, the trial court did not err in denying Johnson's motion for a judgment of acquittal.
XII.
Finally, we address Johnson's contention that the trial court's written sentencing order does not comply with the requirements of § 13A-5-47(d), Ala.Code 1975, which provides:
"Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52. The trial court shall also enter written findings of facts summarizing the crime and the defendant's participation in it."
In the present case, the trial court issued a written sentencing order for each conviction on June 16, 2011. (C. 427, 429.) Then, on July 15, 2011, the trial court issued a written order titled "finding of fact in regard to punishment phase of the trial," and the court issued another written order in which the trial court made findings of fact concerning the crime and Johnson's participation in it. (C. 438-39, 442-46.)
The trial court made written findings that there were two aggravating circumstances: (1) the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, see § 13A-5-49(5), Ala.Code 1975, and (2) the capital offense was committed to disrupt or hinder the enforcement of laws, see § 13A-5-49(7), Ala.Code 1975. (C. 438.) However, the trial court did not make specific written findings concerning the existence or nonexistence *748 of the remaining statutory aggravating circumstances, as required by § 13A-5-47(d). In fact, the other statutory aggravating circumstances were not mentioned in the trial court's orders.
Concerning the statutory mitigating circumstances found in § 13A-5-51, the trial court simply stated: "Although Defendant had no prior criminal activity and Defendant indicated he was under extreme mental or emotional disturbance, the court having weighed the aggravating circumstances and mitigating circumstances finds also the aggravating circumstances outweigh the mitigating and the jury's recommendation as to punishment was fully justified by the facts in the case." (C. 438.) Thus, it appears that the trial court found the existence of one mitigating circumstance: Johnson had no significant history of prior criminal activity. However, although the trial court recognized that Johnson argued that he was under the influence of extreme mental or emotional disturbance, the trial court did not make a specific written finding concerning whether that mitigating circumstance existed, and the trial court did not make specific written findings concerning the existence or nonexistence of the remaining statutory mitigating circumstances, as required by § 13A-5-47(d).
Also, contrary to the requirements of § 13A-5-47(d), the trial court did not make any written findings concerning the existence or nonexistence of nonstatutory mitigating circumstances offered pursuant to § 13A-5-52, even though Johnson offered such evidence, and, at the sentencing hearing, the trial court appeared to recognize that Johnson had offered such evidence.
Therefore, because the trial court's sentencing orders do not comply with the requirements of § 13A-5-47, we must remand this case for the trial court to amend its sentencing orders.
Conclusion
For the foregoing reasons, we hold that none of the issues raised by Johnson on appeal form a basis to reverse his convictions. Further, concerning Johnson's convictions, as required by Rule 45A, Ala. R.App. P., we have searched the record for any error that has or probably has adversely affected Johnson's substantial rights and have found no plain error or defect in the proceedings under review. Therefore, we affirm Johnson's convictions for two counts of murder made capital because the victim was a police officer who was on duty and because the murder was committed by or through the use of a deadly weapon fired within or from a vehicle.
Concerning sentencing, we remand this case with instructions that the trial court amend its sentencing orders to comply with the requirements of § 13A-5-47(d), Ala.Code 1975. On remand, the trial court must "enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52." If necessary, the trial court may reweigh the aggravating and mitigating circumstances and resentence Johnson. On return to remand, we will address any remaining sentencing issues that have not been addressed in this opinion. Due return shall be made to this Court within 42 days from the date of this opinion.
AFFIRMED AS TO CONVICTIONS AND REMANDED WITH INSTRUCTIONS AS TO SENTENCING.
*749 WINDOM, P.J., and WELCH, J., concur. KELLUM, J., concurs specially, with opinion. JOINER, J., recuses himself.
I concur with the main opinion. I write specially as to Part VII of the opinion.
Bart Wayne Johnson argues that the trial court erred in not conducting a colloquy similar to the Boykin/Rule 14.4[3] colloquy required for guilty pleas to ascertain that his decision to withdraw his plea of not guilty and to proceed to trial solely on his plea of not guilty by reason of mental disease or defect was knowing and voluntary. This Court concludes that Rule 14.4 on its face applies only to pleas of guilty and that "there is no such rule of law requiring the trial court to conduct a colloquy when the defendant pleads only not guilty by reason of mental disease or defect." 256 So.3d at 739. Thus, we hold that Johnson's plea of not guilty by reason of mental disease or defect was not the functional equivalent of a guilty plea and that the trial court did not err in not conducting a colloquy with Johnson to ensure that his decision to withdraw his plea of not guilty and to pursue solely a plea of not guilty by reason of mental disease or defect was voluntary.
I agree that the trial court in this case did not err in not conducting a colloquy with Johnson to ascertain whether his decision to forgo his not-guilty plea and to pursue solely his plea of not guilty by reason of mental disease or defect was voluntary. The plain language of Rule 14.4, Ala. R.Crim. P., clearly states that the colloquy required by that rule is necessary only when a defendant enters a "plea of guilty." Additionally, there is no federal constitutional requirement that a defendant who withdraws his or her plea of not guilty and proceeds to trial solely on a plea of not guilty by reason of mental disease or defect must do so voluntarily. However, I do not believe our opinion today should be read as a blanket holding that in no circumstance would a trial court be required to inquire into the voluntariness of a criminal defendant's decision to forgo a not-guilty plea and to pursue solely a plea of not guilty by reason of mental disease or defect. In my opinion, our holding today is limited to the specific facts and circumstances of the case before us, facts and circumstances that establish that Johnson's plea of not guilty by reason of mental disease or defect was not the functional equivalent of a guilty plea.
This is the first time that an Alabama court has had occasion to address the issue whether a defendant who withdraws his or her plea of not guilty and proceeds solely on a plea of not guilty by reason of mental disease or defect must be advised by the trial court of the consequences of his or her decision in a fashion similar to the Boykin/Rule 14.4 colloquy required for guilty pleas. However, other jurisdictions have addressed the issue, and most of those jurisdictions have concluded that in some circumstances due process does require a trial court to engage in a colloquy with a criminal defendant who pleads solely not guilty by reason of mental disease or defect to ensure that the plea is knowingly and voluntarily entered. See, e.g., Duperry v. Solnit, 261 Conn. 309, 329, 803 A.2d 287, 301 (2002) ; Legrand v. United States, 570 A.2d 786, 793 (D.C.1990) ; State v. Shegrud, 131 Wis.2d 133, 137, 389 N.W.2d 7, 9 (1986) ;
*750 State v. Brasel, 28 Wash.App. 303, 312, 623 P.2d 696, 701 (1981) ; People v. Wagoner, 89 Cal.App.3d 605, 610-11, 152 Cal.Rptr. 639, 642 (1979) ; United States v. Brown, 428 F.2d 1100, 1103-04 (D.C.Cir.1970) ; and N.Y. Penal Law § 220.15(3) (McKinney 2014). But see State v. McDowell, 329 N.C. 363, 374, 407 S.E.2d 200, 206-07 (1991).
Those jurisdictions that do require an inquiry into the voluntariness of a plea of not guilty by reason of mental disease or defect appear to do so only when the prosecution does not oppose or dispute the plea itself, i.e., the existence of a mental disease or defect, or when the facts of the case are otherwise not in dispute; in other words, in those situations where the trial, if conducted at all, is nothing but a hollow formality and not adversarial in nature. In State v. Ouellette, 271 Conn. 740, 859 A.2d 907 (2004), the Connecticut Supreme Court addressed a situation similar to the situation in this case and, in doing so, aptly surveyed the law in various jurisdictions:
"The defendant next claims that the trial court's failure to canvass him regarding his plea of not guilty by reason of mental disease or defect violated his constitutional right to due process. In support of this contention, the defendant relies primarily on Duperry v. Solnit, 261 Conn. 309, 803 A.2d 287 (2002), in which 'we conclude[d], in the exercise of our supervisory authority over the administration of justice, that in all future cases in which a defendant pleads not guilty by reason of mental disease or defect, and the state substantially agrees with the defendant's claim of mental disease or defect, with the result that the trial essentially is not an adversarial proceeding, the trial court must canvass the defendant to ensure that his plea is made voluntarily and with a full understanding of its consequences.' Id ., at 329, 803 A.2d 287. Neither the conclusion nor the rationale of Duperry supports the defendant's claim that the trial court's failure to canvass the defendant with respect to his plea of not guilty by reason of mental disease or defect implicated his right to due process.
"Because the defendant relies heavily on Duperry, we commence our review of the defendant's claim with a discussion of that case. Adam Duperry was arrested and charged with arson and manufacturing bombs in connection with the explosion of a pipe bomb at the Institute of Living in Hartford. Id ., at 312-13, 803 A.2d 287. Thereafter, two psychiatrists who had examined Duperry at the request of his counsel concluded that, at the time of the offense, Duperry had been suffering from a severe mental illness and, as a consequence, had lacked the capacity to appreciate the wrongfulness of his actions and to conform his conduct to the law. Id., at 313, 803 A.2d 287 ; see General Statutes § 53a-13(a). In light of these evaluations, the state ultimately agreed not to oppose a plea of not guilty by reason of mental disease or defect, and Duperry, through counsel, agreed to waive a jury trial and not to contest the state's prima facie case regarding the underlying charges. Duperry v. Solnit, supra, 261 Conn. at 313, 803 A.2d 287. Duperry subsequently pleaded not guilty by reason of mental disease or defect, elected to be tried by a court, and, in accordance with their agreement, the state and Duperry presented their respective cases without opposition. Id ., at 314, 803 A.2d 287. At the conclusion of the proceeding, the trial court found Duperry not guilty by reason of mental disease or defect and subsequently ordered that Duperry be committed to the custody of the psychiatric security review board; see General Statutes § 17a-582 (e)(1); and that he be confined in a hospital for psychiatric disabilities for a maximum term of twenty-five *751 years. Duperry v. Solnit, supra, at 314-15, 803 A.2d 287.
"Duperry thereafter sought a writ of habeas corpus, alleging, inter alia, that his due process rights under the state and federal constitutions were violated by virtue of his plea of not guilty by reason of mental disease or defect because he was not apprised of and did not fully understand the consequences of his plea. See id., at 315, 803 A.2d 287. In essence, Duperry claimed that, in light of the rights that he was waiving as a result of the interposition of his affirmative defense of mental disease or defect, and to ensure that he was giving up those rights knowingly and voluntarily, the trial court was required to canvass him in the same manner that it is required, under Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 [ (1969) ], to canvass an accused who pleads guilty. See Duperry v. Solnit, supra, 261 Conn. at 316, 317-18, 803 A.2d 287. After a hearing, the habeas court concluded that the requirements for the acceptance of a guilty plea apply equally to the acceptance of a plea of not guilty by reason of mental disease or defect. Id., at 315-16, 803 A.2d 287....
"The state appealed, and we reversed the judgment of the habeas court, concluding, inter alia, that that court improperly had established a new constitutional rule in a collateral proceeding in contravention of the principle announced in Teague v. Lane, 489 U.S. 288, 316, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Duperry v. Solnit, supra, 261 Conn. at 326, 336, 803 A.2d 287. Specifically, we determined that, in light of Teague, Duperry could not prevail on his habeas claim because, as of December 1988, when Duperry entered his plea of not guilty by reason of mental disease or defect, applicable precedent did not compel the trial court to canvass Duperry in regard to that plea.[33]...
"Notwithstanding our determination in Duperry regarding the habeas court's improper resolution of the constitutional issue, we nevertheless concluded that it was 'appropriate, in light of concerns of fundamental fairness, to consider the substance of this issue pursuant to our supervisory authority for the purpose of providing guidance to trial courts in future cases.' Id., at 326-27, 803 A.2d 287. Upon such consideration, we adopted a rule requiring trial courts to canvass defendants who elect to plead not guilty by reason of mental disease or defect. Id., at 329, 803 A.2d 287. We limited the rule, however, in two respects, both of which are particularly important for purposes of this appeal. First, the rule is prospective in nature, and second, it applies to cases in which 'the state substantially agrees with the defendant's claim of mental disease or defect, with the result that the trial essentially is not an adversarial proceeding....'
"As we observed in Duperry; id., at 327, 803 A.2d 287 ; and as courts in a number of other jurisdictions also have recognized; e.g., Miller v. Angliker, 848 F.2d 1312, 1320 (2d Cir.), cert. denied, 488 U.S. 890, 109 S.Ct. 224, 102 L.Ed.2d 214 (1988) ; United States v. Brown, 138 U.S.App. D.C. 398, 428 F.2d 1100, 1102-1103 (D.C.Cir.1970) ; there are certain practical similarities between guilty pleas and pleas of not guilty by reason of mental disease or defect or by reason of insanity. We know of no court, however, that has required, as a matter of constitutional law, a Boykin-type canvass of a defendant who pleads not guilty by reason of mental disease or defect or by reason of insanity. Moreover, those courts that have required such a canvass have done so not as a matter of constitutional mandate but, *752 rather, on the basis of prudential considerations; e.g., United States v. Brown, supra, at 1103-1104; State v. Shegrud, 131 Wis.2d 133, 138, 389 N.W.2d 7 (1986), cert. denied, 479 U.S. 1037, 107 S.Ct. 891, 93 L.Ed.2d 843 (1987) ; see People v. Vanley, 41 Cal.App.3d 846, 856, 116 Cal.Rptr. 446 (1974) ; Legrand v. United States, 570 A.2d 786, 792-94 (D.C.App.1990) ; and even then, only in circumstances in which the state has not opposed the defendant's claim or in which the facts are not otherwise in dispute. See, e.g., United States v. Brown, supra, at 1103; People v. Vanley, supra, at 853, 116 Cal.Rptr. 446 ; Legrand v. United States, supra, at 788; State v. Shegrud, supra, at 135, 389 N.W.2d 7. Indeed, in truly contested cases, we reasonably may presume that, in light of the adversarial nature of the proceeding, defense counsel will be particularly diligent in advising the defendant of the effect that a claim of mental disease or defect is likely to have on the defendant's rights. In the absence of any precedent or other authority to indicate that a court is constitutionally required to canvass a defendant who pleads not guilty by reason of mental disease or defect, and in view of the fact that the state vigorously contested the defense raised by the defendant, we conclude that the defendant's due process rights were not implicated by virtue of the trial court's failure to canvass him regarding his plea of not guilty by reason of mental disease or defect.
"____________________
" [33] In concluding that the habeas court had adopted a new constitutional rule in violation of Teague, we expressly rejected Duperry's contention that two federal appeals court cases, namely, Miller v. Angliker, 848 F.2d 1312 (2d Cir.), cert. denied, 488 U.S. 890, 109 S.Ct. 224, 102 L.Ed.2d 214 (1988), and United States v. Brown, 428 F.2d 1100 (D.C.Cir.1970), supported his claim that the habeas court had relied on established precedent in holding that the canvass required under Boykin v. Alabama, supra, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274, for cases involving guilty pleas also was required in cases involving pleas of not guilty by reason of mental disease or defect. With respect to Miller, we noted that, although, in that case, the Second Circuit Court of Appeals had recognized the similarities between a guilty plea and a plea of not guilty by reason of mental disease or defect, the court's holding was limited to a determination that, in light of those similarities, the state is equally obligated, under Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to disclose exculpatory information to defendants who plead guilty and to defendants who plead not guilty by reason of mental disease or defect. Duperry v. Solnit, supra, 261 Conn. at 322, 323, 803 A.2d 287 ; see Miller v. Angliker, supra, at 1320. With respect to Brown, we observed that, in that case, the District of Columbia Circuit Court of Appeals had extended the canvass requirement to a defendant who stipulates to all of the issues at trial except sanity. Duperry v. Solnit, supra, at 323, 803 A.2d 287 ; see United States v. Brown, supra, at 1103-1104. We noted, however, that the holding in Brown did not appear to rest on constitutional footing but, rather, upon the court's exercise of its supervisory authority. Duperry v. Solnit, supra, at 324, 803 A.2d 287 ; see United States v. Brown, supra, at 1102-1103. We therefore concluded that neither Miller nor Brown'established the principle that the trial court must, as a constitutional requirement, canvass a defendant who enters [a plea of not guilty by reason of *753 mental disease or defect] to ensure that the plea is made knowingly and voluntarily.' (Emphasis in original.) Duperry v. Solnit, supra, at 323, 803 A.2d 287."
271 Conn. at 762-69, 859 A.2d at 923-27.
Similarly, here, the record establishes that this is one of the "truly contested cases" that did not require an inquiry into the voluntariness of Johnson's decision to withdraw his not-guilty plea and to pursue solely his plea of not guilty by reason of mental disease or defect. Initially, I point out that although the main opinion correctly observes that the State in this case was held to its burden of proving to the jury all the essential elements of the offenses beyond a reasonable doubt, that fact is not dispositive of whether Johnson's due-process rights were violated because, in Alabama, even when a defendant pleads guilty to a capital offense the State still must prove to a jury all the essential elements of the offense beyond a reasonable doubt "in cases where the death penalty is to be imposed." See § 13A-5-42, Ala.Code 1975. The fact, then, that the State was held to its burden of proof does not necessarily indicate that Johnson's plea of not guilty by reason of mental disease or defect was not the functional equivalent of a guilty plea. Rather, it is that fact coupled with the other circumstances in this case that leads to the conclusion that Johnson's plea was not the functional equivalent of a guilty plea.
The record indicates that although Johnson withdrew his plea of not guilty before trial, the jury was never specifically informed of that fact and Johnson never stipulated to the facts of the crimes nor did he expressly concede guilt. In fact, during trial, defense counsel cross-examined the State's witnesses and presented a witness on Johnson's behalf that was unrelated to the affirmative defense of mental disease or defect. Defense counsel also argued that Johnson's mental disease or defect rendered him unable to form the requisite criminal intent necessary to convict Johnson of capital murder. In other words, despite the overwhelming evidence against Johnson, the defense contested the State's case. Likewise, the State vigorously contested Johnson's assertion of mental disease or defect. Both parties presented testimony from multiple expert witnesses, and those witnesses were thoroughly examined and cross-examined. Finally, the record indicates that, despite Johnson's withdrawal of his not-guilty plea, the jury was given the option of finding Johnson not guilty of the capital offenses in addition to the options of finding Johnson not guilty by reason of mental disease or defect or of finding Johnson guilty.
Based on the adversarial nature of Johnson's trial, I agree that the trial court in this case did not err in not conducting a colloquy with Johnson to ascertain that his decision to withdraw his not-guilty plea and to pursue solely a plea of not guilty by reason of mental disease or defect was voluntary.
On Return to Remand
Bart Wayne Johnson was convicted of two counts of murder made capital because the victim was a police officer who was on duty, see § 13A-5-40(a)(5), Ala.Code 1975, and because the murder was committed by or through the use of a deadly weapon fired within or from a vehicle, see § 13A-5-40(a)(18), Ala.Code 1975. The jury, by a vote of 10 to 2, recommended that Johnson be sentenced to death. The trial court followed the jury's recommendation.
On May 20, 2014, this Court affirmed Johnson's convictions but remanded the case for the trial court to amend its sentencing orders because the trial court's sentencing orders did not comply with the *754 requirements of § 13A-5-47(d), Ala.Code 1975. Johnson v. State, 256 So.3d 684, 748 (Ala.Crim.App.2014). Specifically, the trial court did not " 'enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, [Ala.Code 1975,] each mitigating circumstance enumerated in Section 13A-5-51, [Ala.Code 1975,] and any additional mitigating circumstances offered pursuant to Section 13A-5-52 [, Ala.Code 1975].' " 256 So.3d at 748 (quoting § 13A-5-47(d), Ala.Code 1975 ).
On return to remand, the trial court has filed an amended sentencing order in which it found the existence of two aggravating circumstances, i.e., that the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, see § 13A-5-49(5), Ala.Code 1975, and that the capital offense was committed to disrupt or hinder the enforcement of laws, see § 13A-5-49(7), Ala.Code 1975. The trial court specifically found that none of the other aggravating circumstances enumerated in § 13A-5-49, Ala.Code 1975, existed. The trial court also found the existence of one statutory mitigating circumstance, i.e., that Johnson has no significant history of prior criminal activity, see § 13A-5-51(1), Ala.Code 1975. The trial court specifically found that none of the other statutory mitigating circumstances enumerated in § 13A-5-51, Ala.Code 1975, existed. Furthermore, the trial court found that four additional mitigating circumstances offered pursuant to § 13A-5-52, Ala.Code 1975, existed: (1) Johnson's lack of violence before this incident, (2) Johnson's difficult childhood and family background and his success in life despite those difficulties, (3) Johnson's exemplary character before this incident, including the help he had given to other people, and (4) that Johnson was a good husband and a good father to his two children. The trial court specifically gave "great weight" to all the mitigating circumstances. Nevertheless, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court followed the jury's recommendation and sentenced Johnson to death.
Pursuant to § 13A-5-53, Ala.Code 1975, this Court is required to address the propriety of Johnson's sentence of death. Johnson was convicted of two counts of murder made capital because the victim was a police officer who was on duty, see § 13A-5-40(a)(5), Ala.Code 1975, and because the murder was committed by or through the use of a deadly weapon fired within or from a vehicle, see § 13A-5-40(a)(18), Ala.Code 1975.
The record does not reflect that Johnson's sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
The trial court correctly found that the aggravating circumstances outweighed the mitigating circumstances. In its sentencing order, the trial court stated that it found two aggravating circumstances. The trial court then considered each of the statutory mitigating circumstances and found that one statutory mitigating circumstances was applicable. The trial court also found and considered four nonstatutory mitigating circumstances. As described above, the trial court found that each of the mitigating circumstances was entitled to "great weight." The trial court's sentencing order shows that it properly weighed the aggravating and mitigating circumstances and correctly sentenced Johnson to death. The record supports the trial court's findings.
*755 Section 13A-5-53(b)(2), Ala.Code 1975, requires this Court to independently weigh the aggravating and mitigating circumstances in order to determine whether Johnson's death sentence is proper. After independently weighing the aggravating and mitigating circumstances, this Court finds that Johnson's sentence of death is appropriate.
As required by § 13A-5-53(b)(3), Ala.Code 1975, this Court must now determine whether Johnson's sentence is excessive or disproportionate when compared to the penalty imposed in similar cases. In this case, Johnson was convicted of two counts of murder made capital because the victim was a police officer who was on duty and because the murder was committed by or through the use of a deadly weapon fired within or from a vehicle. Sentences of death have been imposed for similar crimes in this State. See, e.g., Woodward v. State, 123 So.3d 989 (Ala.Crim.App.2011) (imposing death sentence for murdering a police officer who was on duty and for murdering the officer by firing a deadly weapon from a vehicle). Therefore, considering both the crime and the defendant, this Court finds that Johnson's death sentence is neither excessive nor disproportionate.
Finally, this Court has searched the entire record for any error that may have adversely affected Johnson's substantial rights and has found none. See Rule 45A, Ala. R.App. P.
Accordingly, Johnson's sentence of death is affirmed.
AFFIRMED.
WINDOM, P.J., and WELCH and KELLUM, JJ., concur.
JOINER, J., recuses himself.
On Remand from the United States Supreme Court
BURKE, Judge.
Bart Wayne Johnson was convicted of two counts of murder made capital because the victim was an on-duty police officer, see § 13A-5-40(a)(5), Ala. Code 1975, and because the murder was committed by or through the use of a deadly weapon fired within or from a vehicle, see § 13A-5-40(a)(18), Ala. Code 1975. The jury, by a vote of 10 to 2, recommended that Johnson be sentenced to death. The trial court followed the jury's recommendation and sentenced Johnson to death. This Court affirmed Johnson's convictions but remanded the case with instructions that the trial court amend its sentencing order and " 'enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, [Ala. Code 1975,] each mitigating circumstance enumerated in Section 13A-5-51, [Ala. Code 1975,] and any additional mitigating circumstances offered pursuant to Section 13A-5-52[, Ala. Code 1975].' " Johnson v. State, 256 So.3d 684, 748 (Ala.Crim.App.2014), quoting § 13A-5-47(d), Ala. Code 1975.[1] The trial court complied with those instructions and again sentenced Johnson to death. This Court affirmed that decision in Johnson v.
*756 State, 256 So.3d 753 (Ala.Crim.App.2014) (opinion on return to remand). The Alabama Supreme Court denied certiorari review, without an opinion, on August 21, 2015.
On May 2, 2016, the United States Supreme Court granted Johnson's petition for a writ of certiorari, vacated this Court's judgment, and remanded the case "for further consideration in light of Hurst v. Florida, 577 U.S. ----, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016)." Johnson v. Alabama, --- U.S. ----, 136 S.Ct. 1837, 194 L.Ed.2d 828 (2016). Both Johnson and the State filed supplemental briefs addressing this issue.
Discussion
In Hurst, the United States Supreme Court held Florida's capital-sentencing scheme unconstitutional because, as it then existed,[2] Florida law allowed a trial judge alone to make the findings necessary to render a defendant eligible for the death penalty. In Ex parte Bohannon, 222 So.3d 525, 531 (Ala.2016), the Alabama Supreme Court analyzed Hurst and explained that "the [United States Supreme] Court held that Florida's capital-sentencing scheme violated the Sixth Amendment right to a trial by jury because the judge, not the jury, found the existence of the aggravating circumstance that made Hurst death-eligible. The Court emphasized that the Sixth Amendment requires that the specific findings authorizing a sentence of death must be made by a jury ...."
In his supplemental brief, Johnson argues that his death sentences are unconstitutional under Hurst, Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and State v. Billups, 223 So.3d 954 (Ala.Crim.App.2016). Specifically, Johnson claims that he was sentenced to death based on the findings of the trial court, and not the jury, regarding the existence of aggravating circumstances; that the jury's advisory verdict did not satisfy the requirements of the Sixth Amendment; and that the trial court's determination that the aggravating circumstances outweighed the mitigating circumstances was a finding of fact that, he says, had to be made by a unanimous jury.
Before analyzing Johnson's specific arguments, we note that the Alabama Supreme Court recently held that Alabama's capital-sentencing scheme is not unconstitutional in light of Hurst. In Bohannon, supra, the Court held:
"Our reading of Apprendi [v. New Jersey, 530 U.S. 466 (2000) ], Ring [v. Arizona, 536 U.S. 584 (2002) ], and Hurst leads us to the conclusion that Alabama's capital-sentencing scheme is consistent with the Sixth Amendment. As previously recognized, Apprendi holds that any fact that elevates a defendant's sentence above the range established by a jury's verdict must be determined by the jury. Ring holds that the Sixth Amendment right to a jury trial requires that a jury 'find an aggravating circumstance necessary for imposition of the death penalty.' Ring, 536 U.S. at 585, 122 S.Ct. 2428. Hurst applies Ring and reiterates that a jury, not a judge, must find the existence of an aggravating factor to make a defendant death-eligible. Ring and Hurst require only that the jury find the existence of the aggravating factor that makes a defendant eligible for the death penalty-the plain language in those cases requires nothing more and nothing less. Accordingly, because in Alabama a jury, not the judge, determines by a unanimous verdict the *757 critical finding that an aggravating circumstance exists beyond a reasonable doubt to make a defendant death-eligible, Alabama's capital-sentencing scheme does not violate the Sixth Amendment."
222 So.3d at 532. Accordingly, Bohannon forecloses any argument that Alabama's capital-sentencing scheme is facially unconstitutional under Hurst. See also Billups, 223 So.3d at 959 ("Alabama's capital-sentencing scheme is constitutional under Apprendi, Ring, and Hurst, and the circuit court erred in holding otherwise ....")
I.
Johnson first argues that, in violation of Hurst, Ring, and Billups, he was sentenced to death based on the findings of the trial court, not the jury, regarding the existence of aggravating circumstances. Johnson correctly asserts that a trial court may not impose a death sentence unless the jury unanimously finds the existence of at least one aggravating circumstance beyond a reasonable doubt. He also points out that the jury's verdicts in the guilt phase of his trial did not establish either of the aggravating circumstances the State sought to prove in the penalty phase because, he says, the aggravating circumstances did not overlap with an element of either capital offense Johnson was convicted of. As this Court explained in Billups:
" 'Many capital offenses listed in Ala. Code 1975, § 13A-5-40, include conduct that clearly corresponds to certain aggravating circumstances found in § 13A-5-49.' Ex parte Waldrop, 859 So.2d [1181] at 1188 [ (Ala.2002) ]. As noted above, 'any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing.' § 13A-5-45(e). When the capital offense itself includes as an element one of the aggravating circumstances in § 13A-5-49 (often referred to as 'overlap'), the jury will make the finding that an aggravating circumstance necessary for imposition of the death penalty exists during the guilt phase of the trial. In those cases, the maximum sentence a defendant convicted of a capital offense may receive based on the jury's guilty verdict alone is death, and Apprendi, Ring, and Hurst are satisfied because the jury's guilt-phase verdict necessarily includes the finding of an aggravating circumstance necessary for imposition of the death penalty.
"When the capital offense does not include as an element one of the aggravating circumstances in § 13A-5-49, the maximum sentence a defendant may receive based on the jury's guilty verdict alone is life imprisonment without the possibility of parole. In those cases (referred to here as 'non-overlap' cases), the jury must make the finding that an aggravating circumstance necessary for imposition of the death penalty exists during the penalty phase of the trial."
223 So.3d at 967.
As noted, Johnson was convicted of murder made capital because the victim was a police officer who was on duty and because the murder was committed by or through the use of a deadly weapon fired within or from a vehicle. During the penalty phase, the State sought to prove the following aggravating circumstances: that "[t]he capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody," § 13A-5-49(5), Ala. Code 1975, and that "[t]he capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws." § 13A-5-49(7), Ala. Code 1975. In *758 McNabb v. State, 887 So.2d 929, 995 (Ala.Crim.App.2001), this Court held that "the capital murder of a police officer under § 13A-5-40(a)(5) does not necessarily include conduct that corresponds with the aggravating circumstances in § 13A-5-49(5) and (7)." Similarly, murder made capital because it was committed by or through the use of a deadly weapon fired within or from a vehicle does not correspond to either aggravating circumstance the State sought to prove in Johnson's case. Johnson is correct that the guilty verdicts alone do not establish that the jury unanimously found the existence of one or more aggravating circumstances beyond a reasonable doubt. Johnson claims that, because the jury did not specifically indicate which, if any, aggravating circumstances it found in the penalty phase, his death sentence was premised on the trial court's separate findings regarding the existence of both aggravating circumstances. This argument is without merit.
In Ex parte McGriff, 908 So.2d 1024 (Ala.2004), the Alabama Supreme Court addressed a non-overlap case in which the defendant was convicted of capital murder committed by shooting the victim from a vehicle. At the penalty phase, the State sought to prove a single aggravating circumstance: that the defendant " 'knowingly created a great risk of death to many persons.' " 908 So.2d at 1026, quoting § 13A-5-49(3), Ala. Code 1975. The Court explained:
"The vote of the jury in its sentencing phase verdict in McGriff's case now before us was ten in favor of death and two in favor of life. The jury did not expressly reveal the number who found the existence of the proffered aggravating circumstance. Ex parte McNabb [, 887 So.2d 998 (Ala.2004),] held that even a non-unanimous death recommendation by the jury proved that the jury, including the jurors who voted against the death recommendation, had unanimously found a proffered aggravating circumstance, even though it was not included within the § 13A-5-40(a) definition of the particular capital murder offense charged in the indictment, because the trial court had expressly instructed the jury that they could not proceed to a vote on a death recommendation unless they had already unanimously agreed that the aggravating circumstance existed. Ex parte McNabb, 887 So.2d at 1005."
908 So.2d at 1038-39.
In the present case, the trial court instructed the jury on multiple occasions that it could not consider recommending a death sentence unless it unanimously found the existence of an aggravating circumstance beyond a reasonable doubt. See, e.g. R. 2212-13("[B]efore you can even consider recommending the defendant's punishment be death in a particular case, each and every one of you must be convinced beyond a reasonable doubt based upon the evidence that an aggravating circumstance exists in that case."); R. 2214("If you should find that no aggravating circumstance has been proven beyond a reasonable doubt in one or both cases, you must return a verdict recommending the defendant's punishment be life imprisonment without the possibility of parole in that particular case or cases."); and R. 2217("In order to consider an aggravating circumstance in each case it is necessary that the jury unanimously agree upon its existence in that case or cases. All twelve of you must be convinced beyond a reasonable doubt that an aggravating circumstance exists in order for any of you to consider that aggravating circumstance in determining what the sentence should be."). Thus, the jury was well aware that, in order to proceed to the process of weighing the aggravating and mitigating circumstances, it must first unanimously *759 determine that at least one aggravating circumstance existed.
However, Johnson's case is somewhat distinguishable from McGriff because, in Johnson's case, the State sought to prove two aggravating circumstances. Thus, the fact that the jury proceeded to weigh the aggravating and mitigating circumstances and returned a recommendation in favor of the death penalty does not necessarily imply that the jury unanimously found the same aggravating circumstance to exist. In Ex parte McNabb, 887 So.2d 998, 1005 (Ala.2004), the Alabama Supreme Court addressed a similar situation:
"McNabb contends-correctly-that, despite his conviction for capital murder, he could not have been sentenced to death unless at least one of the aggravating circumstances set forth in § 13A-5-49 was found by the jury to exist beyond a reasonable doubt. See Ala. Code 1975, §§ 13A-5-45(f) and 13A-5-45(e). McNabb concedes that the jury was instructed to make a unanimous finding as to whether any of the three aggravating circumstances ultimately found to exist by the trial judge existed. He insists, however, that the trial court committed plain error in failing to instruct the jury expressly that it must unanimously find the existence of the same aggravating circumstance. This failure, he contends, created the danger that less than all of the jurors found the existence of any one aggravating circumstance. If that occurred, he argues, then his death sentence is based on factors never found by the jury, and violates the rule set forth in Ring. We find no merit in this argument. The instructions contained a number of premises that, when considered as a whole, apprised the jury of the proper unanimity requirement."
(Footnotes omitted.)
This Court has examined the entirety of the trial court's penalty-phase instructions in the present case. As was the jury in McNabb, Johnson's jury was similarly apprised that it must unanimously find the existence of the same aggravating circumstance in order to even consider recommending the death penalty. In addition to the instructions referenced above, the trial court instructed the jury that "[t]here must be a unanimous agreement on the existence of a particular aggravating circumstance in a particular case before it can be considered by any juror in that particular case." (R. 2217-18 (emphasis added).) It is well settled that " '[j]urors are presumed to follow the trial court's instructions.' " Brownlee v. State, 197 So.3d 1024, 1037 (Ala.Crim.App.2015), quoting Lewis v. State, 24 So.3d 480, 508 (Ala.Crim.App.2006), aff'd, 24 So.3d 540 (Ala.2009). In light of the trial court's instructions, the fact that the jury returned a verdict recommending the death penalty by a vote of 10 to 2 indicates that it unanimously found the existence of at least one particular aggravating circumstance beyond a reasonable doubt.
Johnson attempts to distinguish his case from Ex parte McNabb by quoting a short excerpt from the trial court's jury instructions. He concedes that the trial court instructed the jury that it must find at least one aggravating circumstance in order to recommend a sentence of death but then asserts that the judge "also instructed the jury that it could recommend death based on 'one or fewer aggravating circumstances.' " (Johnson's supplemental brief, at 10, quoting R. 2219, 2244.)[3] Therefore, he says, the trial court "directed the *760 jury to recommend death even if it did not find the existence of an aggravating circumstance." (Johnson's supplemental brief, at 10.)
However, the quoted excerpt Johnson uses to support his argument is taken out of context and presented in a way that is misleading. A review of the entirety of the jury instructions reveals that the quoted passage appeared after the trial court clearly explained to the jurors that they must unanimously find the existence of an aggravating circumstance before considering whether to recommend death. The trial court then proceeded to explain that, if the jury found that one or more aggravating circumstances existed, it was to then proceed to weigh those circumstances against any mitigating factors it found. In explaining the weighing process, the trial court stated:
"The process of weighing aggravating and mitigating circumstances against each other in each case in order to determine the proper punishment in each case is not a mechanical process. Your weighing all the circumstances against each other should not consist of merely adding up the number of aggravating circumstances or mitigating circumstances [and] comparing that number to the total number of mitigating circumstances or aggravating circumstances. That would be improper.
"The law in this state recognizes that's possible in at least some situations that one or fewer aggravating circumstances might outweigh a large number of mitigating circumstances. The law of this state also recognizes as possible, at least in some situations, that a large number of aggravating circumstances might be outweighed by one or a few mitigating circumstances."
(R. 2219.) Contrary to Johnson's argument, this instruction did not suggest that the jury could recommend death even if it did not find any aggravating circumstances to exist. Rather, it explained that the weighing process was not a mere tallying system and that various aggravating or mitigating circumstances might have different weights.
Because the trial court instructed the jury that it could not proceed to consider recommending the death penalty unless it first found a particular aggravating circumstance to exist, the fact that the jury proceeded to the weighing process and voted on whether to impose the death penalty or a sentence of life imprisonment without parole demonstrates that it found at least one particular aggravating circumstance to exist in each case. Accordingly, Hurst was satisfied because the jury made the finding necessary to make Johnson eligible for the death penalty. See Ex parte Bohannon, 222 So.3d at 533 ("Because in Alabama a jury, not a judge, makes the finding of the existence of an aggravating circumstance that makes a capital defendant eligible for a sentence of death, Alabama's capital-sentencing scheme is not unconstitutional on this basis.").
We note that the Alabama Supreme Court has authorized the use of verdict forms with special interrogatories during the penalty-phase deliberations in capital-murder trials. See Ex parte McGriff, 908 So.2d at 1039. Such forms would instruct jurors to record which, if any, aggravating circumstances were unanimously found to exist. The Court gave the following example of a special verdict form in McGriff:
" 'State of Alabama v. Dennis Demetrius McGriff
" 'The first question before the jury is whether the State has proven beyond a reasonable doubt that, in committing the capital offense charged in the indictment, *761 the defendant knowingly created a great risk of death to many persons.
" 'The number of jurors who answer and vote "yes" to the first question is ....
" 'The number of jurors who answer and vote "no" to the first question is ....
" '____________________
" 'Foreperson's signature.' "
908 So.2d at 1039. The use of such forms in the future would remove any ambiguity regarding a jury's penalty-phase findings. However, as explained above, the trial court properly and clearly instructed Johnson's jury as to its responsibilities during the penalty-phase deliberations. Accordingly, there was no ambiguity in the present case. The jury, not the trial court, made the findings that were necessary to make Johnson eligible for the death penalty. Accordingly, his sentences do not violate Hurst, Ring, or Billups.
II.
Next, Johnson argues that the jury's " 'advisory only' " role during the penalty phase did not satisfy the requirements of the Sixth Amendment. (Johnson's supplemental brief, at 11.) Johnson contends that, because the jury's sentencing recommendation is not binding on the trial court, the judge, as opposed to the jury, "must make all of the penalty-phase findings necessary for" a death sentence to be imposed. (Johnson's supplemental brief, at 12.) However, the Alabama Supreme Court addressed this issue in Bohannon and decided it adversely to Johnson. In Bohannon, the Alabama Supreme Court held:
"Bohannon contends that an instruction to the jury that its sentence is merely advisory conflicts with Hurst because, he says, Hurst establishes that an 'advisory recommendation' by the jury is insufficient as the 'necessary factual finding that Ring requires.' Hurst, 577 U.S. ----, 136 S.Ct. at 622 (holding that the 'advisory' recommendation by the jury in Florida's capital-sentencing scheme was inadequate as the 'necessary factual finding that Ring requires'). Bohannon ignores the fact that the finding required by Hurst to be made by the jury, i.e., the existence of the aggravating factor that makes a defendant death-eligible, is indeed made by the jury, not the judge, in Alabama. Nothing in Apprendi, Ring, or Hurst suggests that, once the jury finds the existence of the aggravating circumstance that establishes the range of punishment to include death, the jury cannot make a recommendation for the judge to consider in determining the appropriate sentence or that the judge cannot evaluate the jury's sentencing recommendation to determine the appropriate sentence within the statutory range. Therefore, the making of a sentencing recommendation by the jury and the judge's use of the jury's recommendation to determine the appropriate sentence does not conflict with Hurst."
Bohannon, 222 So.3d at 534.
Thus, contrary to Johnson's assertion, the jury, and not the trial court, made the only penalty-phase finding necessary to expose Johnson to the death penalty, i.e., that at least one aggravating circumstance existed beyond a reasonable doubt. The fact that the jury's sentencing recommendation was not binding on the trial court is of no consequence. Accordingly, Johnson is not entitled to relief on this claim.
III.
Finally, Johnson contends that the result of the process of weighing the aggravating circumstances against the mitigating circumstances is a "fact" that must be made by a jury, not a judge. Johnson argues that, because the jury's sentencing recommendation in his case was not unanimous, the trial court made the findings necessary to impose the death penalty, i.e., that certain aggravating circumstances existed *762 and that those circumstances outweighed any mitigating circumstances that may have existed. Therefore, Johnson says, his death sentence violates Ring and Hurst. However, this argument was rejected in Ex parte Bohannon, 222 So.3d at 532-33, in which the Alabama Supreme Court held:
"Moreover, Hurst does not address the process of weighing the aggravating and mitigating circumstances or suggest that the jury must conduct the weighing process to satisfy the Sixth Amendment. This Court rejected that argument in Ex parte Waldrop, holding that the Sixth Amendment 'do[es] not require that a jury weigh the aggravating circumstances and the mitigating circumstances' because, rather than being 'a factual determination,' the weighing process is 'a moral or legal judgment that takes into account a theoretically limitless set of facts.' 859 So.2d at 1190, 1189. Hurst focuses on the jury's factual finding of the existence of an aggravating circumstance to make a defendant death-eligible; it does not mention the jury's weighing of the aggravating and mitigating circumstances. The United States Supreme Court's holding in Hurst was based on an application, not an expansion, of Apprendi and Ring; consequently, no reason exists to disturb our decision in Ex parte Waldrop with regard to the weighing process. Furthermore, nothing in our review of Apprendi, Ring, and Hurst leads us to conclude that in Hurst the United States Supreme Court held that the Sixth Amendment requires that a jury impose a capital sentence. Apprendi expressly stated that trial courts may 'exercise discretion-taking into consideration various factors relating both to offense and offender-in imposing a judgment within the range prescribed by statute.' 530 U.S. at 481, 120 S.Ct. 2348. Hurst does not disturb this holding."
Johnson further argues that "regardless of whether the weighing process is deemed 'a moral or legal judgment' or an 'element of an offense,' it results in a finding that is required for imposition of the death penalty, and therefore must be made by a jury." (Johnson's supplemental brief, at 17; internal citations omitted). However, this argument misses the distinction between a defendant's eligibility for the death penalty and the appropriateness of the death penalty for that particular defendant. A trial court's independent weighing of aggravating and mitigating circumstances and its resulting determination does not increase the authorized punishment for a capital defendant. Thus, under Ring, that determination does not have to be made by a jury.
In Johnson's case, the jury made the determination that at least one aggravating circumstance existed as evidenced by the fact that it considered and subsequently recommended the death penalty. That is all Hurst requires. The fact that the trial court also found the existence of aggravating circumstances and independently weighed the aggravating and mitigating circumstances did not run afoul of Hurst.
For the foregoing reasons, Johnson's death sentences do not violate Hurst. Johnson's convictions and sentences are also affirmed for the reasons set forth in Johnson v. State, 256 So. 3d 684 (Ala. Crim. App.2014), aff'd on return to remand 256 So. 3d 753 (Ala. Crim. App. 2014).
AFFIRMED.
WINDOM, P.J., and WELCH and KELLUM, JJ., concur. JOINER, J., recuses himself.
Alabama Supreme Court 1170273

This evidence was contained in a psychiatric report prepared by Dr. Charles Ford. This report was admitted into evidence by joint agreement during defense counsel's guilt-phase closing argument. (R. 1959-60.)

We are using initials to protect the anonymity of the prospective jurors.

See Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), and Rule 14.4, Ala. R.Crim. P.

Section 13A-5-47(d), Ala. Code 1975, was amended effective April 11, 2017, to remove language allowing a trial court to override a jury's verdict as to sentencing in a capital-murder case. However, that amendment does not affect Johnson's case. See Act No. 2017-131, § 2, Ala. Acts 2017 ("This act shall apply to any defendant who is charged with capital murder after the effective date of this act and shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to the effective date of this act.") Additionally, the amendment is inapplicable to Johnson because the trial court did not override the jury's sentencing recommendation.

Florida amended its capital-sentencing scheme after Hurst was decided.

The jury asked to be recharged on certain parts of the trial court's instructions. Therefore, the quoted language appears twice in the record.